PETER SHARP, ROLAND SHARP and THOMAS
SHARP, Minors, by Next Friend, GERTRUDE
L. SHARP, v. MISSOURI PACIFIC RAILWAY
COMPANY, Appellant.

**Division One, July 3, 1908.**

1. **PLEADINGS: Liberal Construction: Damage Act.** The stat-
ute requires the allegations of the petition to be liberally con-
strued with a view to substantial justice between the parties;
and  while the Damage Act is in derogation of the common
law and is for that reason to  be somewhat strictly construed,
yet that does not bear on the question of how the pleadings
should be construed.

2. ———: **Damages for Death: All Children: Answer: After Ver-
dict.** The suit was by three minor children named, for dam-
ages for the negligent killing of their father, brought by their
mother as next friend, and the petition averred: "Plaintiffs
state that on the 16th day of September, 1903, they were all
the children of David W. Sharp, now deceased; that said David
W. Sharp departed this life on the 1st day of November, 1903,
and left surviving him his wife, Gertrude L. Sharp, and these
plaintiffs . . .; that plaintiffs are minors under the age of
twenty-one  years," etc. In the answer was the clause: "De-
fendant for answer to plaintiffs' petition in the above-entitled
cause . . . admits that one David W. Sharp died some-
time during the month of November, 1903, and left surviving
him his wife Gertrude L. Sharp and children, Peter Sharp, Ro-
land Sharp and Thomas Sharp." The testimony showed the
ages of the children, and the mother testified without objec-
tion or exception that these three little boys were her only
children by David W. Sharp at the time of his death and their
only children living at the time of the trial. *Held,* that the
petition, after answer and verdict, sufficiently alleges that the
three children named were the only children of David W.
Sharp at the time of his death.

3. ———: ———: ———: **The Word All.** The word all, used in
this petition, when properly construed, in its connection, means
that the three plaintiffs named were the only children the de-
ceased father left surviving him. The petition is sufficiently
full and specific in naming the necessary parties to the action.

4. ———: ———: ———: **Answer.** The admissions of the an-
swer, fairly construed in connection with the allegations of the
petition, concede that the only children that deceased left

surviving him were the three boys named; and in that connection it is *held* that a cause may not be tried on one theory below and heard upon another on appeal.

5. ———: ———: **After Verdict: No Demurrer, etc.** Where defendant filed no demurrer to the petition, and made no objection to the introduction of testimony because the petition stated no cause of action, and made no objection to the specific testimony put in showing the very things it is contended were not alleged, the presumption will be indulged, when the petition is attacked for the first time in the motion in arrest, that defendant considered the petition good.

6. **NEGLIGENCE: Switchman: Defective Grab-Iron.** Plaintiffs' father, a switchman in the performance of his duties, took hold of the grab-iron next to the top of the ladder on a freight car, it gave way at one end and he fell backwards, on an iron rail, and died six weeks later. The grab-iron was fastened by a lag screw, without a nut, screwed, by means of the sharp-edged thread, into the wood, which was rotten, and the screw was rusty. *Held*, that in the absence of evidence that he knew of the rotten condition of the wood or that by the exercise of due caution he could have discovered it, plaintiffs are entitled *to recover on the presentation of substantial evidence tending* to show that his death was due to the injuries received by him in the fall.

7. ———: ———: ———: **Cause of Death.** Where there was evidence that plaintiff's father languished from the moment of the accident, and that as a result of his injuries septic pneumonia, originating from an abscess and blood-poisoning, set in and caused his death, and on the other hand that his death was due to typical pneumonia, independent of his injuries, it was the province of the jury to reconcile the conflict of the testimony, and the court will not interfere with their verdict.

8. ———: ———: ———: **Evidence: Inspection: Not Preserved.** The court cannot hold that it was reversible error to exclude certain evidence without knowing what it was. Without knowing that, the court cannot hold that the excluded evidence was material. Where the court excluded appellant's evidence relating to the inspection of the freight car, whose handhold gave way and caused the switchman to fall, but gave appellant permission to copy the excluded evidence into the bill of exceptions, which was not done, this court cannot hold that its exclusion was reversible error.

9. ———: ———: ———: ———: ———: **Book.** The primary evidence of the inspection of a car is the testimony of the inspector and the tally book made by him contemporaneously with

his inspection, and where they are available a book record made by a clerk, by transcribing upon it the entries made by the inspector on his tally book, is not admissible to show the condition of the car at the time the inspection was made.

10. **INSTRUCTION: No Error Specified.** Where appellant points out no specific error in the instruction given, which on its face seems to be full and correct, but contents itself to saying it is bad law, the court will not search for specific defects, but will adhere to the rule that the judgment is presumed to be right.

Appeal from Jackson Circuit Court.—*Hon. John G. Park,* Judge.

AFFIRMED.

*Elijah Robinson* for appellant.

(1) The petition does not allege that plaintiffs were all of the children that deceased left surviving him at the time of his death, and it cannot be contended that it was not absolutely necessary that all of his children should join in this suit. Any less number could not maintain it, as it can be maintained by no one except those coming strictly within the terms of the statute. The fact that the petition alleges that plaintiffs were all of the children of the deceased some time prior to his death, does not cure the defect, because it does not follow that they were all of the children that he left surviving him at the time of his death. Nor does the fact that the petition alleges that deceased left surviving him his wife and these plaintiffs cure the defect, because it is not alleged that he left no other children surviving him. The fact that the testimony tends to show that plaintiffs were all the children which he left surviving him, does not cure the defect in the petition. A petition, especially one based upon a statutory cause of action, must set forth a complete cause of action, and if it does not do so, the fact that the evidence may have tended to establish a com-

plete cause of action, does not cure the defect. (2) The allegations of the answer do not cure the defect in the petition. There is no allegation in the answer admitting that plaintiffs were all of the children that deceased left surviving him at the time of his death. (3) The evidence shows conclusively that David W. Sharp died of pneumonia, caused by indiscreet exposure on his part; and there is no substantial evidence whatever tending to show that the injury which he had received had any connection with his death. Pneumonia is a disease of such a character and so familiar to the doctors, that no doctor of any degree of intelligence could be mistaken in regard to it. It is true that the doctors testified that sometimes pneumonia results from traumatism, but they all, both the doctors for plaintiffs and the doctors for defendant, testified that where pneumonia results from a blow, it almost invariably appears within twenty-four hours after the injury, and never later than ten or twelve days. (4) The rule that records, kept in the usual course of the business in which the parties are engaged, as permanent records of what occurred in the course of that business, are admissible in evidence, is not confined to books of account of merchandise sold or services rendered. Drumm-Flato Co. v. Bank, 107 Mo. App. 434.

*Gerson B. Silverman* and *Frederick A. Boxley* for respondents.

(1) Appellant's demurrer to the evidence at the close of plaintiff's case, and its motion in arrest of judgment, were properly overruled. The petition meets all the requirements of good pleading and complies with the statute under which this action was brought. Sec. 2864, R. S. 1899; sec. 629, R. S. 1899; Cobb v. Railroad, 149 Mo. 143; Hickory Co. v. Fugate, 143 Mo. 71; Milwaukee Trust Co. v. Van Valkenburgh, 112 N. W. 1083; Allen v. Railroad, 183 Mo. 411. (2) The evidence left no room for the jury to guess as to

the cause of the death of respondents' father. No slender thread, but a mass of evidence, connected his injury and death—a complete chain of causation was established—and whatever question there was on this point was left to the jury with appropriate instructions. Hovarka v. Railroad, 191 Mo. 441; Betz v. Tel. Co., 97 S. W. 20; Knapp v. Railroad, 98 S. W. 70; Peterson v. Railroad, 97 S. W. 860. (3) Appellant invokes the "Shop Book Rule," or the "American Rule," as it is sometimes called, to show error of the trial court in refusing to admit in evidence a book containing a record of inspections made (not by the witness produced) but by appellant's inspectors of cars. That rule applies only to books of account. This book is incompetent for any purpose in this case; it is an *ex parte* statement and not the best evidence to show such inspection. As no book like the one in controversy has ever been offered in evidence to prove a fact such as it was attempted to prove in this case, we are unable to cite this court to any law on the subject. (4) Appellant complains of the court's alleged error in giving respondents' instruction 1. As no specific objection is pointed out or stated, it is evident this assignment of error is not made or taken seriously by appellant; the instruction covers the case, in plain English words.

LAMM, J.—Defendant appeals from a judgment, *nisi*, of $5,000 in favor of plaintiffs who are the minor children of David W. Sharp, deceased, and who sue by their mother, Gertrude L., as next friend.

The gist of the petition is that on September 16, 1903, while in the line of his duty in climbing one of defendant's moving freight cars to get on top, one of the grab-irons or iron rods in the car's ladder pulled from its fastenings as he was using it as a handhold, and thereby the said David W. Sharp, a switchman in

defendant's employ, was caused to fall on his back across one of the rails of defendant's adjoining track, by reason of which he was so greatly injured that on the first day of November, 1903, he died. It is alleged that it was the duty of defendant to keep the grab-irons constituting the ladder or handholds on said car in good and safe condition so that switchmen could with safety climb up and down. That defendant disregarded its duty in that behalf and (to use the language of the petition) "did furnish said David W. Sharp with unsound, unsafe, defective and insufficient equipment in this: that on the said 16th day of September, 1903, one certain grab-iron, or handhold, being one rod of iron, of a ladder constituted of four (or five) rods on the side of a certain freight car then in the possession, control and operation of the defendant, as a sort of ladder by means of which brakemen and switchmen climb upon said cars, was rusted and loose in its fastenings; and that the wood of the car in which said grab-iron, or handhold, or iron rod was fastened was rotten and unsafe." It is further averred that Sharp had no notice of the rusty and rotten condition aforesaid and that such condition could not have been discovered by him with the exercise of due caution and care, but that such defects were known to the defendant or might by the exercise of ordinary care on its part have been known to it; and that the death of Sharp resulted from the fall and injury due to the defective condition of said grab-iron or handhold and the defective and rotten condition of the car to which it was fastened.

The answer admits Sharp was in the defendant's employ as switchman on the 16th day of September, 1903. Admits he received some slight injury on that day, but denies he received injuries to the extent or of the character set forth in plaintiff's petition, denies the accident occurred in the manner alleged in the pe-

tition, and alleges Sharp's negligence but denies its own or that of its agents or employees. It further admits the death of Sharp but denies it was occasioned by injuries received in the accident in question.

In the brief of learned counsel, the following propositions are laid down—on one or all of which a reversal is sought:

(a) "Both defendant's demurrer to the evidence and its motion in arrest of judgment should have been sustained for the reason that the petition did not allege facts that would entitle plaintiff to recover."

(b) "Under the evidence in the case the jury could not find for plaintiffs without making a guess as to the cause of the death of David Sharp; and, that being true, the court should have sustained defendant's demurrer to the evidence."

(c) "The trial court committed error in excluding defendant's record showing the inspections of the car in question."

(d) "The court committed error in giving plaintiff's instruction No. 1."

Contributory negligence is out of the case, nor is there any contention that the judgment is excessive. Other facts and any allegations of the pleadings vital to questions made, will appear in the course of the opinion.

I. The first proposition in the case is that the petition was defective in not stating facts entitling plaintiffs to recover.

Counsel develops the point as follows: *First,* "It was not alleged in the petition who were the children of David Sharp at the time of his death;" and *second,* "So far as shown by the petition in this case, David Sharp at the time of his death may have left surviving him a dozen children other than those who brought this suit."

The point seeks pertinent allegations of the pleadings. Attending to them, the petition contains these averments: ''Plaintiffs for cause of action against defendant, state that on the 16th day of September, 1903, they were *all* the children of David W. Sharp, now deceased; that said David W. Sharp departed this life on the 1st day of November, 1903, and left *surviving him* his wife, Gertrude L. Sharp and *these plaintiffs,* and that said wife, Gertrude L. Sharp, has failed to bring any action against the defendant for the death of said David W. Sharp, though six months have now elapsed since such death occurred; that plaintiff are minors under the age of 21 years, and that Gertrude L. Sharp is the legally appointed and acting next friend for plaintiffs in this suit.''

The answer contains the following clause:

''Defendant for answer to plaintiffs' petition in the above-entitled cause . . . admits that one David W. Sharp died sometime during the month of November, 1903, and left surviving him his wife Gertrude L. Sharp and children Peter Sharp, Roland Sharp and Thomas Sharp.''

In this state of the pleadings, testimony was introduced without objection showing Peter Sharp was ten years old; Roland, six; and Thomas, five. In response to an inquiry, the mother testified without objection or exception that these little boys were her only children by David W. Sharp at the time of his death, and are their only children living now (*i. e.,* at the trial in July, 1905).

It is on the foregoing state of the pleadings and proofs that learned counsel predicate the conclusion that the motion in arrest should have been sustained and the instruction in the nature of a demurrer offered at the close of plaintiffs' case should have been given. Is there substance in such contention? We think not. True, as counsel argue, at common law no one could

maintain a civil action on account of the death of another. True it is that such right of action exists alone by virtue of the provisions of the statute and that under hornbook rules the statute, being in derogation of the common law, must be construed with some strictness. In Jackson v. Railroad, 87 Mo. loc. cit. 429, HENRY, C. J., speaking to the point, said: "It is a statute in derogation of the common law and must receive a reasonably strict construction." But all this is aside the real point. The question is not so much how the statute should be construed as it is how the petition should be construed. The right to sue being in all the minor children, the question is: Does the petition with sufficient certainty show that these minor plaintiffs are the only minor children of David W. Sharp? In construing pleadings under the code the doctrine of *contra proferentem* is not allowed in its one time, common-law vigor and rigor. The old rule is much clipped by statute, section 629, Revised Statutes 1899, which provides that: "In the construction of a pleading, for the purpose of determining its effect, its allegations shall be *liberally* construed, with a view to substantial justice between the parties."

That section of the statute does not change the fundamentals of good pleading where justice demands their strict enforcement. It does not dispense with the necessity of stating directly, or inferentially, the facts on which the pleader depends to secure the objects of his pleading. It does not throw on an adversary the hazard of correctly interpreting the meanings of a pleading, containing doubtful allegations, on one or the other of which such adversary might fairly act. But it does mean that allegations should be liberally construed with a view to substantial justice. It does mean that superrefinement in gloss, a penchant or bias to superfine analysis, the mere arriving at possible and strained constructions are out of place in getting at the

meaning of an allegation in a petition. That language employed in pleadings should be construed with reference to time and place of utterance; should be taken in its plain, ordinary hearth-stone meaning, and such interpretation given as fairly appears within the intendment of the pleader. That is, the intendment most favorable to him shall be allowed—at least, absent a demurrer and present a verdict in his favor, as here. [See authorities collated by the learned annotators of Mo. Ann. Stat. 1906, p. 652.]

Section 629, *supra,* has been often construed, and nowhere more justly and felicitously than in Cobb v. Railroad, 149 Mo. l. c. 143-4, where it is said:

"That statute does not mean to loosen the rules of pleadings where their strict enforcement is fairly demanded, but it means that where the circumstances surrounding the case at the time are such that a liberal construction is necessary to prevent a defeat of justice, then the pleading must be liberally construed. Thus, when an answer to the petition has been filed, and a trial of the issues had, it is too late for the losing party to object to the petition for mere informality or for lack of a distinct averment of an essential fact, if it contains averments from which such fact may be fairly inferred. Justice demands a more liberal construction of the petition after answer and verdict than when its sufficiency is challenged by demurrer or motion to make more definite and certain in the first instance. [Young v. Shickle, H. & H. Iron Co., 103 Mo. 324; McDermott v. Claas, 104 Mo. 14; People's Bank v. Scalzo, 127 Mo. 164.]

"The rules of pleading, though very technical, and often strict, do not rest alone on the arbitrary will of the law-maker, but are founded on that sense of justice which recognizes the right of every party to a lawsuit to require of his adversary a clear and unequivocal statement of his side of the case. When this right is

demanded in due form and in season, it must be heeded as a demand of justice; and it will be no answer to say that the demand is technical. And even after verdict, unless the statements of the petition by fair inference constitute a cause of action, the plaintiff's suit must fail.

"But justice will not allow a party to lie in wait for his adversary, take his chances on a verdict, and then, if it be against him, profit by the strict technicality of the science of pleading, if a liberal construction will obviate the objection.

"This is the meaning of the statute above quoted, and thus construed it is designed to prevent a defeat of justice through a mere technicality, yet does not impair the force of the salutary rules of pleading."

In applying the foregoing interpretation of section 629, *supra,* to the case at bar, we make these observations:

(1) Absent a demurrer to the petition, absent an objection to the introduction of any testimony because the petition stated no cause of action and absent an objection to the specific testimony put in showing that the three minor plaintiffs were the only children of David W. Sharp and his wife, Gertrude—we say, absent each and all of these things, then in such condition of things the presumption may be indulged that defendant, *nisi,* deemed the petition good. Now, in construing pleadings, contracts and other instruments the practical construction put upon them by parties is of great value and is seized upon by courts and applied in the administration of justice. All this is but giving play to the homely adage: Actions speak louder than words—that is, actions in a line of present conduct speak louder than afterthoughts. [Bragg v. Railroad, 192 Mo. loc. cit. 357-8, and cases cited.]

(2) The admissions of the answer, fairly interpreted in connection with the allegations of the peti-

tion, must be construed as a concession that the only children surviving were Peter, Roland and Thomas. A case may not be tried on one theory below and heard on another above.

(3) But (and more broadly) the petition is sufficiently full and precise in the particular questioned. It alleges, in effect, that the three minors named were "all" of the children of David W. Sharp on the 16th day of September, 1903. Coming to the date of his death, it says he left surviving him "these plaintiffs" —*i. e.*, the children named, to-wit, all he had. No court should construe these allegations not to exclude the notion that there was other children, then born or posthumous. Both court and counsel must be held to have put that construction on them at the trial, as heretofore pointed out, and to have deemed the proof offered in that behalf responsive to the allegations.

(4) And, finally, the contention is unsound under Revised Statutes 1899, section 659, directing that: "The court shall, in every stage of the action, disregard any error or defect in the pleadings or proceedings which shall not affect the substantial rights of the adverse party; and no judgment shall be reversed or affected by reason of such error or defect." [See, also, sec. 865, R. S. 1899.]

The point is ruled against defendant.

II. The next insistence is that a demurrer to the evidence should have been sustained. At the close of plaintiffs' case and again at the close of the whole case, defendant asked and was refused an instruction of that character. The present assignment of error seeks the facts. Briefly summing it up, the case made on the facts is this:

The car in question was an old car, designated in the testimony as "a non-air car." The grab-iron giving way was the one next the top. This grab-iron was fastened to the wood of the car by lag screws,

*i. e.,* iron bolts with square tops, a sharp-edged thread
and a sharp point, adapted to screwing into wood and
these bolts were used without nuts.        The grabhold
gave way at one end only, the lag screw pulling out of
the wood.        This wood was rotten and the testimony
shows the screw was loose and rusty, presumably, from
rain getting in the screw hole.        As decedent, about
his master's business, took hold of this grab-iron and
one side gave way, he fell prone a distance of from
seven to ten feet backward and struck his back, two or
three inches above the hip line in that part commonly
spoken of as the small of the back and more learnedly
spoken of as the lumbar region, on an iron rail of de-
fendant's track adjoining.        That he was badly injured
by the fall is put beyond question.        He was twenty-
nine years old, an able-bodied man, weighing between
150 and 160 pounds.        His comrades went to him and
lifted him up.        Presently, they assisted him on an en-
gine and thereby carried him close to his home.        There
was testimony put in by plaintiffs tending to show that
from thence on to his death, day by day he suffered
greatly from inward hurts.        He spat blood at intervals,
his face became drawn, pinched and of bad color.        He
walked in a stooped position, favoring his back.        Had
more or less fever.        His eye became "hollow" and
"blunt," as the witnesses described it.        His appetite
was gone; he pined away, falling off from 20 to 25
pounds in weight, and became much emaciated, being
afflicted with insomnia and nervousness and his kid-
neys refused to act—there being testimony that his
urine was sometimes drawn mechanically.        After his
injury he was unable to do any more work.        Several
times he went to defendant's hospital.        At the end of
twenty days his family doctor was called in and at-
tended him at his home and then ceased his visits.        Sub-
sequently, Mr. Sharp paid several visits to the doctor's

office. An interval followed, and a few days before he died he took to his bed. Three days before his death his family doctor was again sent for and attended him to the end.

On hypothetical questions, put without objection, physicians testified that in their opinion the death of David W. Sharp was attributable to his fall and injury. There being testimony on the part of defendant, as presently seen, that he died from pneumonia, the physicians introduced as experts by plaintiffs testified that there was a sort of pneumonia known as septic pneumonia, originating from blood poisoning. From symptoms outlined in the hypothetical question, they gave it as their opinion that an abscess resulted from the injury in the region of the kidneys, that blood poisoning set in and carried him off.

On the part of defendant, Sharp's family physician was called (without objection) and from him and experts testimony was put in tending to show that his injuries had not a whit to do with his death; that his hurts from the fall were merely muscular, calculated to lame his back temporarily. The family physician not only testified to that effect, but he had no recollection of any kidney trouble or any signs of it or of an abscess. He said Sharp grew better under his treatment and was thinking of returning to work, when he took cold and pneumonia seized him and killed him. That he had not seen him for a while after he ceased his visits to his office, but finally was called about three days before his death and found him in the first stages of typical, progressive, lobular pneumonia, which developed rapidly and resulted fatally. Expert witnesses were introduced and testified there were no symptoms of an abscess near the kidneys and while they admitted there was such a thing as septic pneumonia they denied that Sharp had it but said he died of typical pneumonia, independent of his injuries.

The issues presented on this testimony were submitted to the jury by instructions not criticised by learned counsel. It was for the jury to reconcile the conflict in the testimony, if possible, not this court. A trial is not to a judge alone, nor to a jury alone, but to a judge *and* jury. We cannot say on this record that to attribute the death of Sharp to his injury is a mere guess. If a man, well to-day, is badly injured and from that time on sickens (with symptoms referable to his injury), and, languishing, finally dies, a disagreement among doctors as to the name of the disease on him at the moment of dissolution, does not create a condition from which it can be said that a verdict one way or the other is merely guess work—a wild goose chase into the field of chance and conjecture. Defendant's theory, necessarily, has its root in the notion that plaintiffs' evidence was unworthy of belief; for if there had been no physicians testifying as experts and the jury had been without medical advice, yet plaintiffs' lay evidence showed a cause for Sharp's pain and suffering, and his visible approach to the grave in the steps he took, commencing at the place and time of his injury and ending there, are rational deductions within the right of a jury in applying common sense to facts. The expert medical testimony was merely advisory, and, because the advice given to the jury by the opinions of the doctors differed, that presents no case for our interference. The mysteries of death are inscrutable and baffle complete scientific solution by mortal man. The sting of death is hidden. The best that can be done is to establish a chain of causation—to show a cause (an injury) from which an effect (death) might reasonably follow. We know, without doctors' advice, that men have been killed by falls. We know, too, that death may follow weeks of pain and suffering from inward hurts, having their origin in such a fall. This seems to be such a case, provided of course the

jury believed plaintiffs' testimony. The burden was on the jury under their oaths to hear, weigh and decide. It was their prerogative to believe or disbelieve. Admitting we have the power, yet we have no disposition to interfere with their verdict.

The overruling of the demurrers was well enough and the point is, accordingly, disallowed to the defendant.

III. The next error assigned is the refusal of the trial court to allow defendant's inspection record in evidence. In leading up to the offer of this record, defendant placed upon the stand Mr. Caples, who identified himself as division foreman of defendant's car department at Kansas City. In the summer and fall of 1903, he was foreman of inspectors at the State line. He testified that a record was kept of the inspection of cars at Kansas City under his supervision. The witness had such a record book with him on the stand and identified it. What followed is best told by the following excerpt from defendant's abstract of record:

"Q. Now, I will get you to state how the record of the inspection is made. A. Well, our inspectors are stationed in the yard in the most convenient place to catch the trains, or transfers, as they are delivered or arrive in the yards, and each inspector carries what we call a tally book, a small book in which they take a record of the trains, or the transfers, as we call them, cars from connecting lines, into that little book; take a record of every car, and note on there any defects that they may find; if a car has no defects, why, of course, the book shows blank; they just simply take the number and initial and kind of car, and if it had defects, they make a note of that on that little tally book; those tally books are turned in by the day men that go off duty at six in the evening, as they go off at six in the evening; and by the night men at seven in the morning

as they go off duty; all of those little books are kept by a clerk assigned to that particular work, into those larger record books.

"Q. Into that record that you have your hand on? A. Yes, sir.

"Q. Now, whose duty was it to transcribe the records from the little books onto that permanent record? A. Well, what we call the clerk of the foreman of the inspectors.

"Q. Was that done under your supervision? A. Yes, at that time.

"Q. Did you put a man there to do it? A. We had a man permanently there; he is still—that same man is not there, but there is a man occupying that place, it is a permanent position.

"Q. You had a man there during that time? A. Yes, sir.

"Q. I will get you to state whether or not the entries on the page of the book that is open there were made by that man whose duty it was to transcribe them onto that book from the little books? A. Yes, sir.

"Q. I will get you to state to the jury now whether there is any record of the inspection of Missouri Pacific box car 7727 on that book? A. Yes, sir.

"Mr. Silverman: That is objected to by the plaintiffs.

"Objection sustained by the court.

"Mr. Robinson: I offer to show now the inspections—

"Mr. Silverman (interrupting): We object to the offer; the book can be shown to the stenographer, and the stenographer can copy off what he offers; we object to the offer in this way.

"The Court: Do it quietly.

"Mr. Robinson: I offer to show the record of the inspection of this car prior to the 16th day of August, 1903, on the 6th of August, and the 13th of September.

"The Court: By the book?

"Mr. Robinson: By the record about which I have examined the witness, and I suppose it is not proper for me to state in the presence of the jury what I want to show that the inspection showed, but I will tell the stenographer so that he can get it.

"The Court: He can copy the entries later.

"Mr. Silverman: We object to it.

"Objection sustained by the court.

"To which ruling and action of the court the defendant at the time excepted and does still except.

*"Cross-examination, by Mr. Silverman.*

"Q. Mr. Caples, where is the clerk that made the entry? A. He is not in the service now.

"Q. Is he in the city? A. He is.

"Q. In Kansas City, Missouri? A. In Kansas City, Missouri.

"Q. Where is the clerk, Mr. Caples, or the yard man that transmitted the tab to the clerk? A. That is the one that I answered you about.

"Q. The man that actually made the inspection? A. He is in the service.

"Q. He is in the service? A. Yes, sir.

"Q. Where is he, Mr. Caples? A. He is in the Kansas City, Kansas, yards, in the Cypress yards.

"Q. In the employ of the Missouri Pacific? A. Yes, sir.

*"Re-direct Examination, by Mr. Robinson.*

"Q. How many cars would he probably inspect in the course of a month, Mr. Caples? A. On an average, 200 cars a day.

"Q. Two hundred cars a day? A. That is a rough estimate, you know.

"Q. That is a rough estimate; he inspects a great many cars? A. Yes, sir.

"Q. What is the purpose of keeping this book here that I have called your attention to, so as to have a permanent record? A. So as to have a permanent record, to keep us informed about the condition of the cars.

"Q. When a car is found to be defective, what is done with it? A. It is marked in for repairs, as we say, 'Bad Order.'

"Q. What is done with it then? A. It is taken to the repair tracks, or yards.

"Q. Taken to the repair tracks? A. Yes, sir.

"Q. Then what is done with it? A. The necessary repairs are made."

As shown, permission was given defendant to copy into the bill of exceptions the entries from the permanent inspection book, compiled from the tally books by defendant's clerk, but it appears this permission was not utilized and there is nothing here to show what the inspection record contained with reference to the car in question.

Should we say the trial court erred in excluding defendant's inspection record in the above state of the proof? We think not, for several reasons:

(a) In the first place, if the book were held admissible, even then we cannot say it was error to exclude the entries in it because there is nothing here to show what those entries were or what they tended to prove. Before we can find it reversible error to exclude offered evidence we ought to know what the excluded evidence was; because if it had been preserved and presented to us, we might by inspecting it be able to say it could not materially affect the result one way or the other.

(b) In the next place, assuming the inspector's record showed that the car had been inspected three days before the injury of Mr. Sharp, to-wit, September 13th, and showed no defects, yet we do not think the

book itself was admissible. The primary evidence obviously was the testimony of the inspector himself and his tally book made cotemporaneously with his inspection. The record offered was a mere after-compilation of these tally books in the nature of a ledger kept for the convenience of defendant. Note the following: There is even no testimony the copying was correctly done. There is no excuse offered for the absence of the original memoranda, viz., the tally book and its contents, or for the absence of the evidence of the inspector who made both the inspection and the tally book. In this condition of things it would be dangerously loose practice to permit the introduction of such secondary evidence. We are cited to no well-considered case holding such book admissible on such proof. We take it, its admission would be a novelty in the law, and if we were to allow its exclusion as error we would open the door to grave abuses by such a precedent.

The point is disallowed to defendant.

IV. Defendant's final proposition is that it was error to allow plaintiffs' instruction numbered 1. That instruction is as follows:

"The court instructs the jury that if you find and believe from the evidence that David W. Sharp at the time of the alleged injury was in the employ of the defendant Missouri Pacific Railway Company, as a switchman, that in the performance of his duty he was climbing the ladder on the side of a box car and had reached the handhold next to the top of said ladder, that he took hold of said handhold, and said handhold pulled from its fastenings and said Sharp fell to the ground on his back across an iron rail, that the wood to which said handhold was fastened was rotten and the fastenings of said handhold were rusty so that said handhold was not reasonably secure, and that defendant knew, or by the exercise of ordinary

care could have known of said rotten and rusty condition in time to repair same, and negligently failed so to do, and that David Sharp in consequence thereof, sustained the injuries complained of, and that said injuries were the proximate cause of the death of said David W. Sharp, you will find for the plaintiffs, provided you find that David W. Sharp was at the time of said injury in the exercise of ordinary care.''

At first blush, the instruction has an honest face. Learned counsel has not put his finger on any specific blemish he claims as error. It is said generally to be bad law, but the particulars of its badness (assuming shape, peradventure, in the mind's eye of counsel), remain hid away like ''a worm in the bud.'' As counsel leave them *incognito,* so may we; for if counsel can point no specific blemish, shall we take up the search and hunt for one as with a lighted candle, *ex mero motu?* It is not so written in the law. Absent error, specifically pointed to, a court of review falls back on the benign and ever-present presumption that the judgment was right.

The point is disallowed to defendant.

V. Plaintiffs' counsel stoutly insist we should not consider the bill of exceptions, for reasons named in their brief. But as we seem to have assumed the right to consider the bill, it is not worth while to hark back and discuss our right to do so. We shall assume that, after all, the result reached, and not the point made, is uppermost in counsel's mind and let it go at that.

The premises considered, the judgment should be affirmed. It is so ordered.

All concur.