HATTIE SCHULZ v. ST. LOUIS-SAN FRANCISCO RAILWAY COMPANY, Appellant.—4 S. W. (2d) 762.

Division Two, February 18, 1928.

*E. T. Miller* and *Ward & Reeves* for appellant.

*T. J. Dolin* and *Douglass & Inman* for respondent.

HIGBEE, C.—This is an action by the plaintiff, the widow of August Schulz, based on Section 4217, Revised Statutes 1919, for the penalty provided by the statute for the death of her husband, resulting from injuries suffered by him while a passenger on defendant's railroad on September 1, 1922, Schulz died on May 25, 1923. The petition was filed on October 29, 1923. A change of venue was granted to the Circuit Court of Cape Girardeau County, where plaintiff had a verdict and judgment for $10,000, and the defendant appealed.

The petition alleges, *inter alia*, that August Schulz, plaintiff's husband, was a passenger for hire on one of defendant's southbound trains on September 1, 1922; that defendant maintained a bridge at a point known as Starland, in Perry County, Missouri, over which it ran its trains; that said bridge gave way while the train on which Schulz was a passenger was passing over it and he sustained injuries from which he died on May 25, 1923; that he left plaintiff, his widow, and their infant daughter, Silvian, aged three years, surviving him, who were dependent on deceased for their support, and this suit was instituted within six months after his death. The amended answer reads:

"Defendant for amended answer to the petition herein denies each and every allegation therein contained.

"Admits that on the 1st day of September, 1922, plaintiff's husband, August Schulz, was a passenger on defendant's southbound passenger train out of St. Louis, and admits that when said train reached a wooden bridge near Starland the said bridge gave way and fell under a portion of said train, thereby derailing it.

"Admits that said August Schulz was injured in said derailment, but alleges that said injuries consisted of a lacerated scalp, linear fracture of the right parietal bone about one and one-half inches long, laceration of the middle finger, lacerations of the face, contusions to the right side of the chest.

"Defendant denies that any of said injuries were fatal, or that any or all of them or any injury August Schulz received in said wreck caused his death, but alleges that his death was caused by influenza complicated with meningitis.

"Denies that the plaintiff is entitled to recover the sum of ten thousand dollars or any sum from this defendant on account of the death of the said August Schulz."

There is substantial evidence for the plaintiff tending to show that Schulz was a passenger on one of defendant's southbound trains which left St. Louis about nine P. M., on August 31, 1922; that the train was wrecked on the following morning by the fall of a bridge over Starland Creek; that he sustained several injuries, including a fracture of the skull; that he was taken from the wreck to the defendant's hospital in St. Louis where, he remained under treatment until November 18th following the accident, when he was discharged and returned to his home in Perry County, where he lived with his wife and their little child, Silvian, who was then three years old.

Mr. Schulz was pastor in charge of a small Lutheran church in Perry County, living with his family in a parsonage furnished him by his congregation rent free, with fuel. He was a native of Poland, and spoke also German, Russian, Spanish and English. In addition to his pastoral duties he taught school in the church building, which was attended by the children of his parishoners. His annual income was about $1000. He was thirty-one years old and prior to his injuries enjoyed good health.

After his return from the hospital he took up his work, but constantly suffered much pain in his head where the skull had been fractured. His memory was impaired, he stuttered, he could not commit his sermons, but had to read them or frequently refer to his notes. His system was weakened, his vitality impaired, and at times when preaching he seemed to be about to faint. This condition was progressive. He could not work in his garden on account of the heat of the sun. In May following his return from the hospital, Mrs. Schulz was taken ill with influenza and he assisted in waiting on her. After three or four weeks he broke down and took to his bed, dying on May 25, 1923.

Several members of Mr. Schulz's congregation testified. Their testimony was substantially the same. One of them, Pete Eckert, testified as follows: I visited his home at times; I remember when he died; I saw him while he was sick. I saw him two days before he died; he was in bed at his home at that time; he was conscious when I saw him, and he knew me when I came in. He seemed to be suffering with pains in his head. He was complaining of that sore spot he had on his head and said that bothered him so much; he had fever. After he came home from the hospital in St. Louis I saw him generally every Sunday, and sometimes once or twice a week, that is, between Sundays. I attended his church. After this accident, it seemed like, in his sermons very often it seemed as if he would faint and he would stutter, and his sermons, he would always have to have copies before him and some times he would have to read part of it; it appeared he would stand there for a minute maybe and appeared like he was going to faint most any time, and directly he would start

again. I never observed that condition before this accident. He never had to read any of his sermons or refer to them before this time. That condition existed up until the time he took sick, and it seemed as if it was growing worse. I have had conversations with him after this accident, after he came back from St. Louis, and I noticed he seemed to be very forgetful; you could maybe ask him certain things or ask him to do something for you and it seemed like he would forget all about it; that condition continued up until the time he took sick. Prior to this injury he worked about his garden, but after the injury he was not able to be outside; he couldn't stand the heat of the sun. That place in his head that seemed to hurt him was about here .(indicating)—I don't know which side it was on; he seemed like he was studying about things and he was more quiet-like; he was not the man he was before the accident; he seemed like he had changed altogether. Very often you would see him sit and he would feel of his head, and he would complain that his head hurt him so bad. I saw that frequently, before he got sick and after he got sick, too.

Dr. Phelps, who attended Mr. Schulz, testified: I think he (Schulz) had been down a day or two before I saw him and I diagnosed his condition as influenza up to about the sixth or seventh day and there was a sudden rise in temperature, probably 103 or 104, and he remained in that condition three or four days when he sank into a stupor. I then diagnosed his condition as meningitis, inflammation of the meninges of the brain. When I first called I took the history of his case. I found that the man had suffered with pain continuously since he left the hospital; he suffered pain in his head. After getting a history of his case and diagnosing it, treating him during that last illness, my opinion was that meningitis of the brain caused his death. In my opinion as a physician I think the condition of which he died was caused or contributed to by the injury of which he gave me the history. I may have been mistaken about Mr. Schulz having influenza; it might have been the first stage of meningitis, but when I diagnosed it I took it as influenza.

Dr. Gray Briggs, an X-ray specialist and physician of St. Louis, made X-ray pictures of Mr. Schulz on January 15, 1923, a number of plates of the skull. He testified: The inner table shows some thickening and the diploe, the space between the inner table and the outer table, shows some thinning. There is no positive evidence of fracture and there is no positive indication of depression; there is positive indication of adhesions and some change in the structure of the inner table, i. e., a thickening of the inner table and thinning of the space between the two bones, as shown. There are three very small calcium spots on one side of the adhesion and there are two on the other.

He also testified that a linear fracture sustained on September 1 would not likely show in an X-ray the following January 15, the time the pictures were taken.

After going over the pictures the question was asked: Suppose Mr. Schulz was a passenger on a train and the bridge gave way and the train fell and he sustained an injury to the head as you have found in these pictures; that subsequent to that time he suffered severe pains in the head and had severe headaches at intervals all along until the latter part of May, 1923; that during that time he would have lapses of memory and during the latter part of May he should develop meningitis; in your opinion could that be attributed to pathological conditions such as you have described? (Counsel for defendant objected that the question assumes a hypothetical state of facts which doesn't appear in the evidence; the objection was overruled and an exception saved.) A. I should say it could be.

On cross-examination witness testified: None of the injuries I have found evidence of on Mr. Schulz would produce influenza. I don't think anybody knows the cause of influenza; I don't know about the possibility of meningitis. following it. I took the X-ray pictures on January 15, 1923, at Dr. Todd's request. I told him what the pictures revealed.

Dr. D. C. Todd, a physician residing in the city of St. Louis, testified: I have been in the surgical department of St. Louis University since 1905. I examined Rev. August Schulz on January 15, 1923, at your request (referring to plaintiff's attorney). I found a scar about ten lines wide over both the right and left side of forehead, a large, seemingly depressed scar, or it was a depressed scar, over the right side of the head, extending over the right parietal and somewhat over the right frontal bone. This area was quite tender. He complained of pains in the left side of the neck. I did not treat Mr. Schulz; my examination of him was made at the instigation of the attorney; it wasn't for the purpose of treatment; it was for the purpose of ascertaining his physical condition at that time and the questions I asked him as a part of this examination were questions to elicit symptoms or conditions upon which to base my findings. (MR. ORR: I object to anything that Mr. Schulz said to Dr. Todd during those examinations of which he speaks. It is hearsay. Objection overruled and defendant excepted.) Q. Now, Doctor, suppose that on September 1, 1923, Mr. Schulz got on a passenger train and that train should fall through a bridge and he should sustain the injury to the head you have found, or the condition of the head that you found would be caused by an injury he sustained at that time, state whether or not a blow on the head sufficient to cause the injury, the condition which you found in your examination of him, whether or not it could in your opinion have affected the brain or the organs of the brain in

any way? A. It could have, yes, sir. Q. Suppose that prior to the date of the accident, September 1, he was not suffering from lapse of memory and did not have the injuries and after that he should suffer from lapse of memory and from headaches and pain, I will ask whether or not, in your opinion, the lapse of memory and headaches and the pain suffered, could or might have been caused from the injury resulting in the condition which you found? A. They could or might have been caused from such, yes, sir. Q. Suppose Mr. Schulz contracted meningitis in May, 1923, I will ask if, in your opinion, that meningitis could have been caused by an injury to the brain, or to the organs of the brain, resulting from the accident described? A. The meningitis could have followed as the remote result of an injury of this type, but could not be a primary condition. What I mean by that is that this man had an injury to this part of the head (indicating on exhibit). My diagnosis is that the head was injured. And the brain—that he was showing signs of softening of the brain; he was weakened and he was devitalized, and the very fact of devitalization in general and the very fact of the local pain in the brain, being a weak point due to injury; should the infective condition take place that causes meningitis, or should be—in other words, should there be this infection in the system, of whatever type it might be, it could attack the area and cause the trouble mentioned. Meningitis is the infection of the meninges, or membranes of the brain; inflammation of the covering of the brain; it is a terrible disease. If some part of the body has suffered an injury so that it becomes weakened or the power of resistance lowered, that part of the body is more apt to attack by disease or germs than any other part of the body; the complications attending things like that are always worse than the primary trouble.

On cross-examination: There was a depressed area on the right side of the head adhering to the skull; about one and a half inches from the top of the head, and about two inches long; not what you would call a linear scar; it was more a destruction of mass tissue. Q. Doesn't it come in his (Price's) table of cases that a very large percentage of meningitis results from influenza? A. Well, I haven't got that, but it is the accepted fact that a percentage of them do. Q. In fact, though, a greater percentage of meningitis, except cerebro-spinal meningitis, results from influenza than any other cause? A. That is your judgment. I am not able to verify that. I haven't the table on hand. I couldn't say—it is not my experience or observation that it is true at all; I couldn't say. The first time I met Mr. Schulz was January 15, 1923; the last time was the latter part of February. (Here defendant's counsel read several letters written by Mr. Schulz in December, 1922, and early in January, 1923, to the defendant company urging a speedy settlement of his claim for dam-

ages for his personal injuries, and the witness being asked, said there was nothing in the letters that would show that Schulz was mentally abnormal. Q. If those communications were written prior to January 15, if there was any abnormal mentality to result from his injury it would be apt to develop earlier, would it not? A. No, sir.

On re-direct examination: Q. With reference to the letters, I will ask you if signs of abnormality in the mind should take place after an injury, isn't it a fact they frequently occur years afterwards? A. Yes, they do. From my record of cases where the party would sustain a lick on the head, and would apparently be normal for a period of two or three years, and then become mentally deranged as a result of the blow. A blow on the head, sufficient to jar the brain, even though it don't result in a fracture, is as serious, ordinarily, as if the same blow had resulted in a fracture. The shock is primarily on the brain; the effect of it, yes; as a rule, where there is no other lesion, it occurs in lesion form.

The appellant offered four physicians and surgeons. Their testimony was heard by the jury, but it need not be set out here for the purpose of this appeal.

I. Appellant insists that the trial court erred in overruling its demurrer to the evidence because (1) a finding that death was the result of bodily injuries, effected through accidental means, cannot be reached by an inference based upon an inference, or cannot be based upon mere conjecture, and (2) where the death may be due to either of two existing causes, accident or disease, for one only of which the defendant is liable, mere proof that the one for which the defendant is liable as a possible cause is not sufficient; before plaintiff is entitled to have the cause submitted he must show with reasonable certainty that the death was caused by the injury received in the wreck.

Appellant cites in support of this contention, Phillips v. Travelers Ins. Co., 231 S. W. 947, decided in this division. That was an action based upon a policy of accident insurance. The plaintiff contended that the insured received injuries by a fall on a stairway which resulted in his death. There was no substantial evidence that the deceased fell, or that he sustained his injuries by an accidental fall. It was held that the burden was on plaintiff to show that the insured received bodily injuries, effected directly and independently of all other causes, through external, violent and accidental means, causing his death, and that where one insured under an accident policy was in a diseased condition and cerebral hemorrhage took place immediately prior to his death, it was not proper to build upon the inference of a fall from the fact of a bruise the further inferences that such fall was the result of accident rather than disease, and that the fall was

the proximate cause of insured's death. Inference cannot be built upon inference to establish a fact necessary to be proven. [Syl. 2 and 3.]

Counsel also cite Atherton v. Railway Mail Association (K. C. Ct. App.), 221 S. W. 752, where it was held it could not be inferred that because an insured in an accident policy was exhausted from his night's work as mail clerk, he suffered an accidental wrench, strain or shock from lifting burdens he was unaccustomed to handle. [Syl. 3.]

In Swearingen v. Railroad, 221 Mo. 644, 659, 120 S. W. 773, cited by appellant, Judge Fox, referring to Yarnell v. Railroad, 113 Mo. 1. c. 580, recognized the rule as announced in the foregoing cases. He then said:

"In announcing the final conclusion in that case it was ruled that it was quite legitimate, when facts are admitted or proven, to draw from them such reasonable inferences as will be sufficient to sustain a verdict; but without this basis of fact a presumption has no office to perform."

It will be freely conceded, as contended by appellant, that before plaintiff is entitled to recover she must show with reasonable certainty that her husband's death was the result of the injuries he sustained in the wreck of the train on which he was a passenger. [Warner v. Railroad Co., 178 Mo. 1. c. 134, 77 S. W. 67.]

The evidence for the plaintiff has been briefly summarized. The amended answer admits that Mr. Schulz sustained a linear fracture of the skull, one and one-half inches long. He was then taken to the hospital where he remained eleven weeks. Prior to his injuries he was in good health physically and mentally; thereafter his memory failed, he stuttered, suffered constantly with severe headaches; he showed signs of softening of the brain; his system was weakened and devitalized, and these conditions grew worse until his death, so that his system was unable to resist or throw off the poison of infection. The evidence shows that his neighbors waited on him during his illness, yet no one contracted meningitis. [See Wheeler v. Fidelity & Casualty Co., 298 Mo. 1. c. 642, 251 S. W. 924.] Dr. Briggs testified that meningitis could be attributed to the pathological conditions he described. Dr. Todd testified that meningitis could have followed as a remote result of the injuries and devitalized condition, while Dr. Phelps, the attending physician, testified that, in his opinion, the condition of which Mr. Schulz died was caused or contributed to by the injuries "of which he gave me the history."

In 1 Sutherland on Damages, sec. 36, p. 138, it is said:

"If the negligence of a carrier results in an injury to a passenger by which his system is rendered susceptible to disease and less able to resist it, . . . and death results, the injury is the proximate

cause thereof, although the disease is to be regarded as an intervening agency and the malady which attacked him was prevalent in the community.''

We quote from the opinion of Judge LAMM in Sharp v. Railway Co., 213 Mo. 517, 531, 111 S. W. 1154:

''We cannot say on this record that to attribute the death of Sharp to his injury is a mere guess. If a man, well today, is badly injured and from that time on sickens (with symptoms referable to his injury), and, languishing, finally dies, a disagreement among doctors as to the name of the disease on him at the moment of dissolution, does not create a condition from which it can be said that a verdict one way or the other is merely guess work—a wild goose chase into the field of chance and conjecture. Defendant's theory, necessarily, has its root in the notion that plaintiff's evidence was unworthy of belief; for if there had been no physicians testifying as experts and the jury had been without medical advice yet plaintiff's lay evidence showed a cause for Sharp's pain and suffering, and his visible approach to the grave in the steps he took, commencing at the place and time of his injury and ending there, are rational deductions within the right of a jury in applying common sense to facts. The expert medical testimony was merely advisory, and, because the advice given to the jury by the opinions of the doctors differed, that presents no case for our interference. The mysteries of death are inscrutable and baffle complete scientific solution by mortal man. The sting of death is hidden. The best that can be done is to establish a chain of causation—to show a cause (an injury) from which an effect (death) might reasonably follow. We know, without doctors' advice, that men have been killed by falls. We know, too, that death may follow weeks of pain and suffering from inward hurts, having their origin in such a fall. This seems to be such a case, provided of course the jury believed plaintiffs' testimony. The burden was on the jury under their oaths to hear, weigh and decide. It was their prerogative to believe or disbelieve. Admitting we have the power, yet we have no disposition to interfere with their verdict.''

In MacDonald v. Railroad, 219 Mo. 468, 481, 118 S. W. 78, Judge LAMM said:

''In Sorenson v. Railroad, 36 Fed. 166, plaintiff's intestate in September, 1883, jumped from a train at the instance of the conductor and thereby suffered severe bruises. He soon began to 'droop and fail,' and in September a year later died. There was in that case as in this a suggestion that heart and aortic troubles existed prior to the injury. Physicians testified on both sides, and Mr. Justice BREWER, speaking to the point, said: 'Where medical witnesses disagree in opinion and theory, the undisputed history of the case is often the most satisfactory and controlling fact. In this case such

history fully justified the verdict. . . . Soon after this accident he began to droop and fail, and so continued failing, with a short and light change for the better in the spring of 1884, until his death in September, 1884. Such a fact is significant, and upholds the verdict.'

"In the case at bar there was substantial testimony that Judge MacDonald came to old age hale and hearty. On a certain day in October he is thrown against the framework of a stove and struck a tremendous blow. The mere visible sign of his injury at the time was not great, but it would be dealing only with the surface of things to stop with that visible sign. The controlling fact in the case (deducible from its history) is that, traceable to that injury, he was never again a well man, and that traceable to that same injury, after a rally at the start, he went steadily downhill to his grave. A blow such as he received was shown to be a probable cause of *angina pectoris*. As we see it, there is no link out in the chain of the evidence upon which the jury could rationally base their conclusion that the injury caused his death. Independent causes were suggested and conflicting theories were developed before the jury. It was for them to say which theory was the most reasonable. [Seckinger v. Mfg. Co., 129 Mo. 590; Fetter v. Fidelity & Casualty Co., 174 Mo. 256.]"

The case of DeMaet v. Moving Co., 231 Mo. 615, 132 S. W. 732, was certified to this court from the St. Louis Court of Appeals on a dissent by Judge Goode. The Court of Appeals reached its conclusion that there could be no recovery, as will be seen in the last paragraph on page 617, on the ground that: "The most that can be said for the plaintiff is that the whole evidence, taken together, shows that death resulted either from the injury received from the buggy, or from one of three chronic diseases of long standing, but which of these conditions was the cause can only be a matter of conjecture."

This court, speaking through Judge Graves, said, top page 618:

"The opinion, in effect, concedes that the effect of the alleged injury might have been the cause of the death. It says there are four causes to which the death might have been attributed."

With this evidence in this situation, Judge Graves said it was a case for the jury to reason out, and then added:

"But, beyond what he sets out in full, it must be remembered that it was shown that the plaintiff was downtown in apparent good health, at the time she collided with the vehicle of the defendant. It should also be remembered that she went home and took to her bed and there remained until the date of her death. . . . Reading the evidence for the plaintiff, it appears that her attending physician said that whilst he did not know exactly what caused the death of the woman, yet, in his opinion, it either resulted from a hemorrhage of the brain

or from the shock. Opposed to this theory was the testimony of the physician holding the autopsy.''

Again, on page 619:

''The facts of the case at bar justified the submission of the case to the jury and the demurrer to the testimony was properly overruled by the trial court. On this question, and this is the only one passed upon by the Court of Appeals, the judgment of that court is wrong and the judgment of the circuit court is right.''

In McGinnis v. Printing Co., 122 Mo. App. 227, 99 S. W. 4, the plaintiff contracted typhoid fever after an injury and the court said, on page 234, with reference to whether or not the injury caused or contributed to cause the fever:

''Neither side introduced evidence conclusive of the question. We think, however, it was overwhelmingly shown that plaintiff, at the time she received the injury, was a strong and healthy young woman, and that there was no indication of typhoid fever in her system. And the expert testimony tended to show that her injuries rendered her more susceptible to disease than should have been the case otherwise.''

In Hartzler v. Railroad, 140 Mo. App. 665, 126 S. W. 760, where decedent was injured and contracted pneumonia thereafter, the evidence on this issue will be found, beginning on page 672. The court held under the evidence it was a question for the jury and said, at the top of page 673:

''As there was no evidence of any other injury to deceased, it was left to the jury to infer from the testimony whether or not her disease might be attributed to the injury in question.''

The contention was there made that pneumonia did not directly flow from and was not a disease that would naturally follow the injury and could not have been reasonably anticipated or foreseen. The court said, bottom page 673;

''It is true no one could have foreseen that the injury received by deceased would result in pneumonia and death, but it does not follow that defendant would not be liable. It could be foreseen, however, if deceased fell from the moving car she would, in all probability, suffer an injury; the extent and all the consequences that might flow from it could not be foreseen, but, for that reason, it will not do to say that for such unforeseen consequences there could be no recovery. The defendant's confusion arises out of the effort to separate the consequences of the act from the act itself.''

In Quackenbush v. Railroad, 73 Iowa, l. c. 461, where plaintiff was hurt on the nose and later developed catarrh, and ''one Dr. Eberle was examined as a witness and was asked whether an injury upon the nose might produce catarrh, and, if so, how. To this he answered: 'It might by progression. Any inflammatory action of the mucous membrane may produce catarrh. A lacerated wound of the carti-

laginous portion of the nose adjoining the nasal bones would produce inflammatory action.' " Two other doctors who had made an examination of plaintiff testified they found his nose inflamed, but "all testified, however, that they had never known a case where catarrh had been produced by injury to the surface of the nose, and one testified that the books gave no instances where catarrh was known to so originate, but he testified that there may be such a result."

In Kuenzel v. St. Louis, 278 Mo. 277, 212 S. W. 876, where plaintiff fell and fractured her hip July 12, 1914, BOND, C. J., said, page 280: "She was thereafter confined to her bed until the 19th day of September, when she died after a six-day attack of pneumonia, which the medical experts state sometimes follows a fracture." And, on page 281: "Whatever might be our own view of the causative relation of these two happenings, it is sufficient to say that the facts and circumstances disclosed on the trial rendered it proper to submit to a jury the question of relativity of the two events, and whether the first was the proximate cause of the last, and their finding concludes this question of fact in this court."

In Solomon v. Moberly Light & Power Co., 303 Mo. 622, 640, 262 S. W. 367, Judge RAILEY quoted approvingly from Judge Fox in Conner v. Railroad, 181 Mo. l. c. 411, as follows:

"If there is substantial evidence tending to show that an accident occurred in any one of two or more ways, or any other number of ways, while the burden rests upon the plaintiff to establish such cause of the accident as would render the defendant liable, *it by no means presents a case of mere conjecture; but it is a question of fact, which should be submitted and determined by the triers of the facts. We only enter the field of conjecture in the absence of proof; when proof enters, conjecture disappears.*"

As stated, Dr. Phelps, the attending physician, testified that in his opinion the condition of which Mr. Schulz died was caused or contributed to by his injuries, of which Mr. Schulz gave him the history. This was competent testimony. [O'Leary v. Scullin Steel Co., 303 Mo. 363 (2), 260 S. W. 55.] Considering the history of the case we are of the opinion that the evidence made a submissible case and that the demurrer to the evidence was properly overruled.

II. Appellant's learned counsel insist there was error in the admissibility of testimony, (a) in proving a conclusion that Mr. Schulz seemed not able to carry on a line of thought, (b) error in certain hypothetical questions propounded to Dr. Briggs, and (c) Dr. Todd's evidence was hearsay because he did not examine Mr. Schulz for the purpose of treatment, but to ascertain his condition for the purpose of testifying as a witness.

The fifth assignment of error in the motion for a new trial is that the court erred in admitting on the part of the plaintiff prejudicial and improper testimony.

In Bartner v. Darst, 285 S. W. 449, 451, in an opinion by Judge Railey, we held a similar assignment of error in the motion for a new trial was not sufficient to point out to the trial judge the alleged error complained of in order that he might have an opportunity to correct his error if one had been made. [See also Robinson v. Railroad (Mo. App.), 288 S. W. 109, 112.]

If we follow this ruling it must be held that the errors assigned by counsel were not raised in appellant's motion for new trial. These views, however, are opposed to the ruling in Wampler v. Railroad, 269 Mo. 464, 190 S. W. 908, wherein three of the judges dissented, holding that Section 1485, Revised Statutes 1909, now Section 1267, Revised Statutes 1919, providing that "all motions shall be accompanied by a written specification of the reasons upon which they are founded; and no reason not so specified shall be urged in support of the motion," applies to motions for new trial.

At the trial a witness was asked if the sunshine affected him (Schulz). The answer was "he couldn't be outside when the sun shines." After the answer it was objected that this was invading the province of the jury and is an opinion of the witness. The objection came too late after the question was answered.

Dr. Briggs was asked: Now, you speak of other pathological conditions that might be associated with such an injury; I will ask you if those conditions that you have described, whether they would show up immediately, or if they would be apt to show up at any subsequent date? Mr. Orr: "I am moving to strike that question because the things he had mentioned that might be associated is no evidence that any of those things were present in this case and is just confusing the jury to ask this witness things foreign to this lawsuit." This was overruled. The answer was: "If they would show up at all, they would show up much later."

The witness was then asked: If Schulz was injured on the train and sustained injuries to the head "as you have found in these pictures" (referring to the X-ray pictures introduced in evidence) and he suffered pains in the head, headaches and lapse of memory and in May developed meningitis, whether or not that could be attributed to pathological conditions such as you have described? It was objected that these hypothetical questions were not based upon statement of proven facts.

It is undoubtedly true that a hypothetical question should be predicated on the testimony. [Root v. Ry. Co., 195 Mo. 377, 92 S. W. 621.]

We think the question was properly predicated on the proven facts and there is no merit in the objection.

Dr. Todd testified that he made a physical examination of Mr. Schulz, not for the purpose of treatment, but at the request of Schulz's attorney for the purpose of ascertaining his physical condition at the time. "The questions I asked him as a part of his examination were questions to elicit symptoms or conditions upon which to base a finding." Q. "Now, doctor, I will ask you with reference to the head, to state in full just what examination you made of that, further than you have testified to, and your finding at that time, if you made any at that time." MR. ORR: "My objection is it is hearsay and doesn't come within the exception of the rule where a doctor elicits information for the purpose of treatment as a basis for the treatment, and isn't elicited for that purpose." The objection was overruled and defendant excepted. Dr. Todd answered in substance that the nature of the injury to the head brought forth a question regarding its tenderness and Schulz answered that it was tender at all times. Another question brought forth the answer that there were headaches and that they were constant. These were not statements relating a past condition or the history of the injuries. It was clearly shown, without contradiction, by other witnesses that Mr. Schulz suffered the pains he mentioned to Dr. Todd.

The rule is that a physician may give in evidence the declarations of a patient as to a present existing pain or malady, but statements with respect to past physical conditions are hearsay. [Magill v. Boatmen's Bank, 288 Mo. l. c. 498, 232 S. W. 448, and Hutchinson v. Railroad, 288 S. W. (Mo. App.) 94.] We think the objection was properly overruled.

III. In appellant's assignments of error it is said that the court erred in giving Instructions A, B, B2 and C. The motion for new trial alleges error in the giving of Instructions A, B and C, but makes no complaint of B2. Appellant, in its brief, complains of plaintiff's Instruction A, which reads:

"The court instructs the jury that if you find from the evidence that on or about the first day of September, 1922, August Schulz was a passenger on one of the defendant's trains, and that the train was wrecked by the fall of a bridge and August Schulz was injured, then the law presumes that the wreck of the train and injury to August Schulz, if any, was caused by some act of negligence on the part of the defendant, and before you can deny plaintiff a recovery on the ground that the fall of the bridge was not due to some act of negligence on the part of the defendant, the burden is cast upon it to rebut this presumption of negligence and

establish to your reasonable satisfaction that the fall of the bridge was not caused by its negligence.''

This instruction is substantially the same as Instruction 1 approved in Bond v. Railroad, 288 S. W. 781, which was an action for damages for personal injuries growing out of this same wreck. There was no error in giving this instruction.

Appellant makes no complaint in its brief of the giving of instructions lettered B and C.

The deceased was thirty-one years of age at his death and his life expectancy was 34.62 years. The plaintiff and her child were dependent on him for support. We do not regard the verdict as excessive. [Grier v. Ry. Co., 286 Mo. 523, 228 S. W. 454; Treadway v. U. Rys. Co., 300 Mo. 156, 282 S. W. 441 (7).] The judgment is affirmed. *Davis* and *Henwood, CC.,* concur.

PER CURIAM:—The foregoing opinion by HIGBEE, C., is adopted as the opinion of the court. All of the judges concur.