DEE MORTON v. ST. LOUIS-SAN FRANCISCO RAILWAY COMPANY, Appellant.—20 S. W. (2d) 34.

Division One, September 13, 1929.

*E. T. Miller, Mann & Mann* and *Phil. M. Donnelly* for appellant.

*Fred W. Lewis, E. L. Rayborn* and *Haymes & Dickey* for respondent.

SEDDON, C.—This action was commenced in the Circuit Court of Wright County, from whence it went on change of venue to the Circuit Court of Webster County. The plaintiff sued to recover both compensatory and punitive damages for personal injuries alleged to have resulted from a willful, unprovoked, unlawful, violent and malicious assault, committed upon the body and person of plaintiff, while he was a passenger upon defendant's railroad train, by a servant and employee of defendant, who, at the time of the alleged assault, is alleged to have been exercising the authority delegated to him by defendant and having to do with the operation of the said train.

The petition charges, in substance, that plaintiff was a passenger for hire upon defendant's railroad train, having taken passage thereon on September 13, 1924, from the town of Mansfield, Missouri, to the city of Memphis, Tennessee; that he was wrongfully, willfully and maliciously assaulted, maltreated and injured at the hands of one of defendant's servants and employees engaged in the operation of said train, whereby plaintiff received and suffered certain described injuries; that such act or assault was willfully, unlaw-

fully, violently and maliciously done and committed by defendant by and through its servant and employee; and the petition prays the recovery of compensatory damages in the sum of $10,000, and punitive damages in the same amount. The answer admits the ownership and operation of the line of railroad by defendant, and denies generally each and all of the averments of the petition.

The trial of the action resulted in a verdict of the jury, finding the issues for plaintiff and assessing his actual, or compensatory, damages in the sum of $5,000, and assessing punitive damages against defendant in the sum of $3,000. After an unsuccessful motion for a new trial, the defendant was granted an appeal to this court from the judgment entered upon the verdict.

The evidence of plaintiff shows that the defendant operated an excursion train from Springfield, Missouri, to Memphis, Tennessee, on the night of September 13, 1924. Plaintiff and his wife were passengers on said excursion train. They boarded the train at Mansfield, Missouri, at ten o'clock on the evening of September 13, 1924, plaintiff purchasing two round-trip tickets from Mansfield to Memphis, and return, for the transportation of himself and his wife. One of defendant's employees engaged in the operation of said train was one Ed Gammon, who is designated in the record as a "special officer" of the defendant railway company. It is stipulated in the record that it was the duty of said Gammon, "as such officer and agent of the defendant, to maintain order on said train, to protect the property of the railway company from loss and injury, and to protect the passengers on such train from being molested, disturbed or injured by other passengers, or by persons who were not passengers thereon, while the said passengers were within the coaches of said train."

Plaintiff and his wife, together with other passengers from Mansfield, took seats in one of the coaches of said train. Plaintiff testified that about dawn of the morning of September 14, 1924, he suddenly became ill and started to go to the toilet room of the coach in which he and his wife were seated. The toilet room was located in the front end, and on the left side, of the coach. Plaintiff testified that, as he reached the front end of the coach, he "must have fainted," and that he had no recollection of reaching or entering the toilet, or of anything that occurred while he was in the front end of the coach; that the next thing he knew one Dr. Latimer, a physician, was in the toilet room with plaintiff, and that the physician assisted plaintiff into the smoking car of the train, which was the car immediately in front of the coach in which plaintiff had been seated. Those witnesses who saw plaintiff fall near the toilet room of the coach testified that he "just crumpled up;" that he seemed to be limp; and that he "kind of slumped down" in the aisle of the coach.

The defendant's "special officer," Gammon, was in the rear of the coach at the time plaintiff fell, and Gammon immediately went to the front end of the coach, where plaintiff had fallen in the aisle. Several passengers who were seated in the coach testified as witnesses on behalf of plaintiff.

Mrs. Maggie Shinpaugh thus testified as to the occurrence: "When he (plaintiff) sank down, he was kind of behind the stove, I think, in the end of the coach next the engine. On the north side of that coach there was a toilet; he was on the opposite side of that; on the opposite side of the aisle; he was in that end of the car. He just kind of gave way, kind of slumped down. I don't think he fell hard; he just kind of gave way and sank to the floor. . . . I saw special agent Gammon there just after the man fell. He (Gammon) picked him up, kind of got in behind him and kind of held him up and walked him to the toilet door. . . . He (Gammon) held him up and opened the toilet door and took his knee and kind of pushed him (plaintiff) in.

"Q. Can you tell where he (Gammon) struck him (plaintiff) with his knee? A. I wouldn't say. Gammon did not go in with him. Gammon picked him up from the back and then Mr. Morton's back was to Gammon's chest, and he opened the door with one hand and held him up with the other and pushed him in with his knee; he turned him loose. Gammon shut the door and stood there then."

Cross-examination: "Q. And he (Gammon) helped him to the toilet door? A. Yes, sir. Q. Opened the door and helped him in the toilet, didn't he? A. Yes, sir. Q. Mr. Morton acted like he was limp and a little hard to handle, didn't he? A. Yes, sir; he did. Q. You don't know whether Mr. Morton fell when he went into the toilet or not? A. No, sir. Q. There was nothing unusual that you saw there about Mr. Gammon's demeanor towards this man, was there? A. I couldn't say that there was. Q. Did he help him into the toilet? A. It looked that way. Q. The man looked very bad? A. Yes, sir; he did. Q. There was nothing unusual in Mr. Gammon's manner in the matter at all, was there? A. No, sir."

George Dewhirst testified: "I saw Dee Morton along early in the morning while I was on that excursion train up in the front part of the coach; saw him go up there. He seemed to be trying to get a drink when he first got up there. The drinking fountain is right there by the toilet, on the north side of the coach. He just fumbled around there a little bit, then he seemed to be trying to hold to the wall; while he had his hands on the wall, he kind of crumpled down on the floor. . . . I saw him fall; he didn't fall hard. He did not get up. I saw Ed Gammon, the special agent of the Frisco there. He got Morton by the collar, or upper part of his clothes, and kind of picked him up half way, and helped him up

938

with one hand and felt around over him with the other. Felt around like he was searching him or something; he held him, still held him with one hand like, and he opened the toilet door with the other hand, and he just held him up in a half-up position with one hand, and he gave him a boost with his knee and shoved him into the toilet; he did not go in the toilet with him; he shut the door. Q. Where did his knee strike Mr. Morton? A. Well, it was the lower part of his body, in the rear. He picked him up with one hand; caught him by the upper part of the clothes, collar or somewhere."

Cross-examination: "The man had hold of his clothes with one hand and pushed him into the toilet with his knee. Q. Now, just show the jury how he could get his knee up on Morton's back? A. I didn't say he had his knee in his back; in the lower end of his body. Q. You don't call it his back; you never saw him with his knee in this man's back, did you? A. I couldn't say that I did."

Virgil Dewhirst testified: "Along early in the morning I saw Mr. Morton go towards the front of the car. When Mr. Morton went to the front of the car I suppose he was sick or something; anyway, he stood there and fell to the floor; as he fell he put his hands out, caught on the front of the car and slid down to the floor. Slid his hands down, and after that Ed Gammon came forward and took him sort of by the clothes or the back of his neck, raised him up with one hand and opened the toilet door, and Mr. Morton wasn't able to stand by himself; he was partly down then, and Gammon gave him a boost with his knee on the inside and shut the door. When Mr. Morton fell he sort of crumpled up; kind of squatted down, I mean; that is, he fell in a heap. He was up at the front of the car. When he fell he had his hands on the front of the car, and when he fell he held his hands out and kind of slid down. Ed Gammon, when I first saw him, was on the first or second seat on the opposite side of the car from where I was. When Mr. Morton fainted, he (Gammon) got up and went to where he was, picked him up by the back of the neck or clothing with one hand. Q. Show the jury where he (Gammon) hit him (plaintiff) with his knee, as near as you can. A. Well, just about the belt, somewhere in the back. I couldn't say which side it was on; I couldn't say with which knee he hit him; he opened the door as he had him in that position and hit him with his knee about the belt and shoved him into the toilet; he closed the door. I don't think Gammon went in the toilet. He turned him loose when he hit him with his knee. Q. How did he handle Mr. Morton? A. Well, rather rough. Q. When Mr. Morton was boosted into the toilet did he appear to be conscious or unconscious? A. Unconscious. Q. Was he limber? Yes, sir; he was limber. Q. You say he didn't walk over there; did he appear to be able to walk over there? A. No, sir."

Cross-examination: "Q. Which knee did Gammon use to put against this fellow? A. I don't know. Q. Which hand did he use? A. I couldn't say about that. Q. Do you know how many hands he used? A. One. Q. You saw what took place? A. To the best of my knowledge, he only used one hand all of the time. Q. How high did he raise him after he took hold of him? A. Well, almost to a standing position. Q. He raised him right up from where he had fallen? A. Yes, sir. Q. After he had done that, he (Gammon) opened the toilet door, didn't he? A. Yes, sir. Q. And helped Mr. Morton in the toilet, didn't he? A. He put him in there. After he had raised him up, when Morton went into the toilet, he (Gammon) pulled the door to. Q. Now, show the jury how he (Gammon) put plaintiff in the toilet. A. I can't say which knee he used, but he hit him along about the belt; along about here (witness indicated). Q. Did the man fall on his head in the toilet? A. I don't know; I wasn't in there."

Clarence Shinpaugh testified: "I did not see Morton fall up in front, by the toilet; my wife called my attention to it. I looked around and some man had him up in his arms; I think he had him under both arms. Q. What did this man who had hold of him do with him? A. He just opened the toilet door and put him in the toilet. Q. How did he hold him when he opened the toilet door? A. He held him with one hand under his arm. Q. What position was Mr. Morton in when he (Gammon) put him in the toilet? A. Well, he looked like he was kind of limp. Q. Was he (plaintiff) standing upright? A. Not clear up. Q. Will you show the jury how far down he was when Gammon put him in the toilet? A. He put him in with his knee and hand; it looked that way; I don't know which knee he used, but he seemed to use his knee this way (indicating). Q. Could you tell where his knee hit him in the back? A. No, sir; I couldn't. Q. Could you tell about where it hit him? A. Well, I could not say for sure. Q. Morton had his back to Gammon? A. Yes, sir. Q. And he put him in the toilet with his knee, you say? A. Yes, sir. Gammon did not go in there with him; he closed the door after he put him in there. Q. How did Gammon handle him? A. Well, he handled him a little rough, it looked like. Q. Now, did you say anything to Gammon, or did he say anything to you? A. Yes, sir; I went up and asked him (Gammon) what was the matter with him. He told me that Mr. Morton was drunk. Q. What was Mr. Morton's condition when Gammon had hold of him and put him in the toilet? A. Well, he looked like he was sick or something; he was limp. I couldn't know whether he was conscious or unconscious; he was limp."

Cross-examination: "Q. Show the jury about how he (Gammon) used his knee. A. Just about that way (indicating). Q. Now,

show the jury where he hit him. A. He put him in something like that (indicating). Q. Now, the place you say he hit him is entirely below the back? A. I won't say; I wasn't close enough to tell. Q. That is your best judgment as to how it was done? A. I wouldn't say where his knee did hit him. Q. After Mr. Morton went into the toilet, you didn't see him at all? A. No, sir."

Mrs. Morton, the wife of plaintiff, testified: "Mr. Morton didn't get sick that I know of in the night. I didn't just see him go up in front; I know that he left me, just got up out of the seat. I had been asleep, just woke up; he got up and left me. I did not see him fall up in the front of the coach. Mrs. Shinpaugh, sitting up in front of me, called my attention to it. I rushed up there to assist him. Q. Who did you see when you got up there? A. I saw Mr. Ed Gammon there. He was the special agent of the Frisco railroad on the train that night. I rushed up there; I said, 'What is going on here?' He said, 'What is it to you?' I said, 'This is my husband.' He said, 'Too much corn juice; too much corn juice; go back to your seat; I will take care of him.' I just stood there for a minute thinking what I would do; and he said again, 'Too much corn juice, I will take care of him.' . . . I went for Dr. Latimer; he was two coaches ahead; I got Dr Latimer, and when I brought him back I told Gammon this was our home doctor, to let him in the toilet; and he just stood there with his hand on the door knob all the time; as I passed by him, he kind of frowned. Q. When you first went up there and had that first conversation with Gammon, judging from his appearance and the manner in which he spoke, what was his attitude of mind? A. Well, he was just mad; he was angry and his face was awfully red. Q. In what tone of voice did he speak to you when he did answer your questions? A. Well, he was just real angry, just wanted me to move out, not to stay there. Q. When you walked up there, first had this conversation with Gammon, did you see your husband? A. I did; I saw him in the toilet. The door was about half open; Gammon had his hand on the door knob; he was looking in, and I kind of rushed in, tried to get in, but couldn't get in for him (Gammon). Gammon wouldn't let me in. Q. Wouldn't let you into the toilet where your husband was? A. No, sir. Q. Tell the jury where your husband was; his position in the toilet. A. He was between the window and the stool in the toilet; he was just apparently getting up from the floor, all humped up, and he had hold of the window sill or the little rod there, a little rod under the window sill. Q. What was your husband's appearance when you saw him there? A. He was awful pale, very pale; just deathly sick, and big drops of sweat all over his face, just big ones."

Dr. B. E. Latimer testified: "I was not in the coach when Mr. Morton fainted and was put into the toilet. Mrs. Morton came up after

me, and I went back then. I saw Ed Gammon there at the door of the toilet; I think he asked me if I was a doctor. I told him that I was. Q. Did he make any further remarks? A. My remembrance is that he said the fellow was drunk; he either told me that, or Mrs. Morton told me he said that; I wouldn't be positive which. I went into the toilet; Mr. Morton, I believe, was sitting on the stool of the toilet, and he was very pale, sweat standing out on his face, and looked just like a man that had fainted; he was sick and he was about half conscious, and he was mad and complaining. He was real sick. I would hardly figure that he was fully at himself; he was in a condition that he might talk to you, but not have any remembrance of it; you take a fellow—he may be roused up enough to speak and answer questions, and still be sick enough not to remember it; that is about as near as I could describe his condition. I think I just bathed his face with a little cold water, something like that, and then took him out in the smoker and raised the window, where the air could strike him.''

The defendant adduced the testimony of several passengers, who were seated in the coach at the time, tending to show that Gammon did not assault the plaintiff, or handle him in a rough or violent manner, but that Gammon merely assisted plaintiff into the toilet after plaintiff had fallen in the aisle. Gammon testified: ''When I saw him fall, I went to him and picked him up. He was lying kind of on his right side and face, and I went to him and just reached under his arms and lifted him up. I put each hand under his arms. I just reached over, got him under the arms and picked him up like that (indicating); held him there a few seconds; he said, 'Help me to the toilet;' I just turned him, just like this (indicating), still held my right arm around him, opened the door with my left hand, and he stepped into the toilet; I stood there, held the door a few minutes, and he had taken down his pants, and I pulled the door to, so he could get on the stool, and I shut the door. Q. Did you see him sit down on the stool? A. Sit down on the stool? Yes, sir. Q. Did you see him take down his trousers? A. Yes, sir. Q. Was he sitting on the stool when you pulled the door to? A. Yes, sir. Q. You may state to the jury whether or not you kicked him with your knee? A. No, sir. I did not. Q. You may state to the jury if you pushed him or threw him into this toilet? A. No, sir. Q. Did you use any force whatever in helping this man into the toilet other than you have told the jury? A. No, sir; I didn't. Q. Did you use your knee to get him into the toilet? A. No, sir; I didn't. Q. You may state, after you picked him up, how close you held him to your chest? A. Well, I held him right up against me. Q. While you were holding him, were you holding him in a position that you could have kicked him in the back with your knee? A. I don't think so. Q. What was

the condition of Mr. Morton when he first fell, just from your observation? A. Well, when I got to him he was awfully pale, looked to be very sick. Q. Did you know whether he had been drinking or not? A. No, sir, I did not; I imagined he had when I saw him fall; there were a good many people drinking on the train; that was the first conclusion I came to. Q. When you raised him up you observed that he was pale? A. Yes, sir. Q. Then did you know whether he had been drinking or not? A. No, sir.. Q. You wouldn't say that he was or wasn't? A. I wouldn't say that he was, or wouldn't say that he wasn't. Q. When you got to Mr. Morton did you say anything to him? A. No, sir; never said a word to him. Q. Did you say anything to him at any time there while you were helping him into the toilet? A. No, sir. Q. After you helped him, did he, with your assistance, walk into the toilet? A. He walked into the toilet himself; stepped into the door. Q. And he was sitting on the stool when you closed the door? A. When I pulled the door to. Q. Do you know whether he fell off the toilet after you pulled the door to? A. I couldn't say about that; I never saw him any more till after he came out of the toilet. Q. Was anything said there by you about he might be drinking whiskey there? A. Well, nothing more than what I said to Mrs. Morton. Q. What did you say to her? A. I said, 'Maybe he has got too much corn.' Q. You didn't know whether he was sick or drinking? A. No, sir; I didn't know whether he was sick or drinking; there were a good many people drinking on the train; that is, a good many people had been drinking on the train. Q. Why did you lift Mr. Morton up out of the aisle and help him into the toilet? A. To get him out of the way. . . . Q. He was unconscious? A. I don't think so. Q. His body was limber? A. He was pretty limber; yes, sir.. . . . Q. Did you push him into the toilet? A. No, sir; I didn't push him into the toilet. Q. Kick him with your knee? A. No, sir; I didn't kick him with my knee. Q. When did you close the front door? A. After he sat down on the stool. Q. And you shoved him in the toilet and turned him loose? A. I didn't shove him in. Q. Did you turn him loose? A. I opened the door, and he stepped in the toilet himself. Q. Walked in there himself? A. Yes, sir.''

We find no evidence in the record tending to show that plaintiff was intoxicated, or that he had been drinking intoxicating liquors while a passenger upon the train, or before boarding the train. Both plaintiff and his wife testified that plaintiff had not partaken of any intoxicating liquor during the journey to Memphis on defendant's train. There was evidence to the effect that, several days before plaintiff started upon the journey to Memphis, he had suffered from a sore, or blood blister, upon one of his hands, that his wife had treated the sore, and that several red streaks extended upwards on the arm from such sore, indicating that plaintiff had suffered from

an infection, or a blood poisoning. One of his hands was bandaged when plaintiff took passage on defendant's train.

Plaintiff testified that, upon arriving in Memphis, he experienced considerable pain in the small of his back on the left side, and that he had difficulty in walking, requiring the assistance of his wife, and the aid of a cane, in getting about. Plaintiff and his wife left Memphis, on the return trip, on the night of September 14, 1924, arriving at Mansfield the next morning. Plaintiff testified that he immediately went to his home at Hartville, a few miles distant from Mansfield, where he went to bed and had his wife rub his back with liniment. Plaintiff's wife testified that, upon arriving home, she examined plaintiff's back and found a bruised place, black and blue in color, and about the size of a saucer, on the left side of plaintiff's back, and that she discovered several freshly-skinned places on plaintiff's elbows and shins; that the bruised place on plaintiff's back continued to show for eight or ten weeks thereafter. Plaintiff's wife was corroborated in her testimony by a young woman, a cousin of plaintiff's wife, who resided with the Mortons, and who testified that, a few days after plaintiff's return from Memphis, she saw a black and blue bruise, about the size of one's hand, on the left side of plaintiff's back. Plaintiff and his wife testified that plaintiff, at times, passed blood upon urinating, a symptom which plaintiff had not exhibited prior to the railroad journey in September, 1924.

Plaintiff was attended by several physicians, but did not call a physician until several weeks had elapsed after his return from the excursion trip. Dr. Latimer testified that, several weeks after the excursion trip, plaintiff called upon him and complained of his back hurting; and that Dr. Latimer gave plaintiff treatments for rheumatism and lumbago, but that plaintiff did not respond to such treatments. Dr. Latimer testified that he made no physical examination of plaintiff, and that he merely accepted plaintiff's statements as to the pain in his back, and from such statements, he diagnosed plaintiff's ailment as being rheumatism or lumbago. Another physician, Dr. Mott, testified that he examined plaintiff in November, 1924, and found a red and swollen place, about eight inches long and five or six inches wide, in the small, or lumbar region, of plaintiff's back, on the left side; that the discoloration lasted for some time, and that the place of the discoloration seemed to be tender upon pressure; and that such an inflamed condition as he found on plaintiff's back would ordinarily be caused by an injury, or by some direct force or violent blow upon the back. There was medical testimony offered on behalf of plaintiff tending to show that his ailment and physical condition is, or might be, attributable to a trauma, or a violent blow, upon the back. Defendant offered medical testimony to the effect that plaintiff's physical condition might be attributable to a septic in-

fection; or to a severe strain resulting from lifting heavy loads; or to stone in the kidneys; or to osteoarthritis. Defendant's medical witnesses, however, expressed the opinion that plaintiff's condition could or might result from trauma.

Plaintiff's evidence tends to show that, prior to his illness, plaintiff (who was forty-two years of age at the time of the alleged assault) had been engaged for several years in the business of hauling heavy freight by truck between Hartville and Mansfield; that he conducted such business without any help or assistance, himself driving the truck, and lifting and handling the heavy freight hauled thereon; that he had had no serious illness prior to September 14, 1924, the date of the railroad excursion trip, and had not theretofore suffered from rheumatism, or experienced any pain in his back or kidneys, or passed blood in the urine. Several witnesses testified that plaintiff was a strong, able-bodied man prior to the time of the excursion trip to Memphis in September, 1924. Plaintiff's evidence furthermore tends to show that, since said date, plaintiff has been unable to perform any manual labor; that he is unable to lift a bucket of water, or to lift his small children; that he has been unable to longer continue his business of hauling freight, because of his physical condition, and that he was obliged to sell and dispose of his truck business; that he suffers continuous pain; that he is unable to turn over in bed without holding to the head of the bed; and that he has lost in weight. Plaintiff's medical witnesses expressed the opinion that his injury is a permanent one.

I. The appellant assigns error in the refusal of the trial court to give, at the close of all the evidence, a peremptory instruction, in the nature of a demurrer to the evidence, directing a verdict for the  defendant railway company. It is urged by appellant that plaintiff's cause of action is predicated solely and singly upon an alleged willful and intentional assault, committed upon the body and person of plaintiff by an agent and employee of defendant who was then engaged in the operation of the train upon which plaintiff was a passenger; that there is no substantial evidence that the act or conduct of defendant's agent and employee, Gammon, was willful, intentional, or malicious; and that, if there be any substantial evidence whatsoever entitling plaintiff to a recovery against the defendant, plaintiff's cause of action, or right of recovery, is one for simple negligence only, arising out of the careless and negligent handling of plaintiff by defendant's agent and employee, Gammon, and not for a willful, intentional and malicious assault. In other words, it seems to be the contention of appellant that there is a fatal variance between the cause of action, or specific ground of recovery, alleged in the

petition, and the proof offered to sustain such cause of action, and that plaintiff was allowed a recovery upon evidence which, at most, tends to establish merely simple negligence, whereas plaintiff sought a recovery for an intentional, willful and malicious assault.

A demurrer to the evidence admits as true every fact and circumstance which the evidence adduced by plaintiff tends to prove, and the plaintiff is entitled to the benefit of every inference of fact which may reasonably be drawn therefrom. [Stauffer v. Railway Co., 243 Mo. 305, 316.] In ruling upon a demurrer to the evidence, the appellate court must consider and view the evidence in the light most favorable to plaintiff. [Stauffer v. Railway Co., supra; Goucan v. Cement Co., 317 Mo. 919, 929.]

The evidence on behalf of plaintiff tends strongly to show that plaintiff became suddenly ill and proceeded to the toilet room in the forward end of the coach on which he was a passenger; while nearing the toilet room of the coach, plaintiff fainted, and "gave way," or "crumpled up," or "slumped down," in the aisle; his body was "limp and limber," and he appeared to be unconscious, or, at least, only semi-conscious; his appearance was that of a very sick man, large drops of perspiration standing out upon his face, and his face was very pale. All of the witnesses seemingly agree that the appearance and actions of plaintiff indicated that he was either very ill or intoxicated. Defendant's special officer, Gammon, testified that, when Gammon reached the plaintiff, "he (plaintiff) was awfully pale; looked to be very sick; he was pretty limber." While there is some conflict in the testimony as to the manner in which Gammon handled plaintiff, there is positive testimony by certain of plaintiff's witnesses that Gammon lifted plaintiff by the collar, or clothing, or by the back of the neck, and that Gammon used his knee in placing plaintiff in the toilet room; that Gammon "gave him (plaintiff) a boost with his knee and shoved him into the toilet; pushed him into the toilet with his knee;" that Gammon "hit him (plaintiff) with his knee, in plaintiff's back about the belt, and shoved him (plaintiff) into the toilet;" that Gammon "turned him (plaintiff) loose when he hit him with his knee;" and that Gammon handled plaintiff "rather rough," or "a little rough," as some of the witnesses described Gammon's conduct. There is evidence that Gammon stated to one or more of the witnesses that plaintiff was drunk; that, when plaintiff's wife went to her husband's assistance, Gammon said to her that plaintiff had "too much corn juice;" and Gammon admitted, by his own testimony, that he had reached the conclusion that plaintiff had been drinking intoxicants; and, furthermore, when Gammon was asked why he lifted plaintiff from the aisle, he answered, "to get him out of the way." In other words, the testimony respecting Gammon's acts and conduct gives rise to the fair and reasonable inference that

Gammon believed that plaintiff was intoxicated, and, therefore, that Gammon's main object or purpose in handling plaintiff was to "get him (whom Gammon believed to be a drunken man) out of the way;" and that Gammon, because of his belief that plaintiff was intoxicated, was somewhat "out of patience" with plaintiff. There is no evidence in the record that plaintiff was intoxicated, or that he had been drinking intoxicants while a passenger on the train, or before taking passage upon the train. Plaintiff's wife testified that, judging from the appearance of Gammon, and from the manner in which he spoke to plaintiff's wife, "he was just mad; he was angry, and his face was awfully red; he was just real angry, just wanted me to move out, not to stay there." There is no evidence that plaintiff's conduct was provocative of any rough handling of plaintiff by Gammon, or that plaintiff's condition (limp, limber, and semi-conscious though plaintiff may have been) called for the use, by Gammon, of any unusual or violent force, strength or effort in lifting or assisting plaintiff from the aisle into the toilet room. Nor does the evidence show that plaintiff offered any resistance to Gammon's effort to get plaintiff "out of the way" in the aisle.

Accepting the evidence on behalf of plaintiff as true, and viewing the evidence in the light most favorable to plaintiff, and allowing to plaintiff the benefit of every inference of fact which may reasonably be drawn therefrom, we are of the opinion that the evidence is substantial and sufficient to establish the commission of the alleged assault upon the body and person of plaintiff by defendant's servant, agent and special officer, Gammon. The evidence being sufficiently substantial to establish the commission of the alleged assault, the presumption arises therefrom that the assault was wrongful, willful, intentional and malicious.

The presumption, or rule of evidence, respecting the intent to commit an assault, or an assault and battery, is thus stated in 5 Corpus Juris, 662, 663: "Every person is presumed to intend the natural and probable consequences of his acts; hence some of the elements of defendant's liability and of plaintiff's cause of action, such as defendant's intent or malice, or the wrongfulness or unlawfulness of defendant's acts or conduct, may be supplied, thus creating a prima-facie case, where it is shown that the injury was caused by violence to the person, or that defendant acted with wanton, willful or reckless disregard of plaintiff's rights. . . . It is not essential, however, that he (plaintiff) should show, in the first instance, by direct evidence, either an intention to commit the injury or that defendant was in fault; but the fact that an assault was committed, or the manner of its commission, may constitute a prima-facie case in plaintiff's favor, thus casting on defendant the duty of rebuttal."

In Luttermann v. Romey, 143 Iowa, 233, 235, the Supreme Court of Iowa, in discussing the presumption of wrongful intent to commit an assault, or an assault and battery, say: "Any application of unlawful force to another constitutes an assault and battery. [Webb's Pollock on Torts, 247.] 'Every man is the sole custodian of his own physical person. No other has a right even to touch it unlicensed, and another wrongs him who does to him any physical violence, however slight,' and one who by force inflicts on the body of another 'the suffering or indignity of actual contact, however slight, is liable to the other in damages.' [Bishop on Non-contract Law, sections 189, 190.] The intent is immaterial, if the act is not justified or excusable, or with the assent of the person upon whom the act is committed.

"The only intent required to constitute an assault and battery is the intent to do the unlawful act. [Vosburg v. Putney, 80 Wis. 523.] The allegation of an assault carries with it the allegation of illegality. [United States v. Lunt, 1 Spr. 311; 26 Fed. Cas. No. 15,643.] While the injury must be intentionally inflicted, yet, if inflicted by violence, the law presumes a wrongful intent, and it rests with the person inflicting the injury to show the innocence of the intent. [Atkins v. State, 11 Tex. App. 8.]"

Our own court has very recently said, in Gray v. Earls, 298 Mo. 116, 135: "The petition does not use the word 'intentionally,' but, taking the language actually used, it must be construed as charging that the 'wrongful act' was intentionally done. This necessarily includes 'malice' in the sense in which the term is used in the law. It need not be any personal ill-will toward the party injured. It may be of a general nature, let the injury fall where it may. It may be wantonness or reckless disregard of the rights of others. [McNamara v. Transit Co., 182 Mo. 681; Trauerman v. Lippincott, 39 Mo. App. 486; Goetz v. Ambs, 27 Mo. 28.]"

We think that the evidence adduced by plaintiff made a prima-facie case of wrongful, intentional, willful and malicious assault, by defendant's agent and servant, Gammon, upon the body and person of plaintiff. While the evidence on behalf of defendant tended to rebut plaintiff's evidence respecting the intentional and willful commission of an assault by Gammon, the ultimate issue was one of fact for the determination of the jury. "The force and effect of presumptions of fact are for the jury, as is also the question whether they have been overcome by the evidence introduced to rebut them." [38 Cyc. 1518.] There is no variance between the cause of action alleged in plaintiff's petition and the proof offered by plaintiff to establish such cause of action. Hence, appellant's insistence that the peremptory instruction, in the nature of a demurrer to the evidence, should have been given by the trial court, because of variance between the allegations of the petition and the proof, must be denied.

It is furthermore urged by appellant that the peremptory instruction to find for defendant should have been given "because there is no substantial evidence that plaintiff's injuries and disability are referable to the treatment plaintiff received at the hands of the special officer, Gammon." Plaintiff's evidence tended to show that, prior to the assault of Gammon upon plaintiff's body and person, plaintiff had not suffered from any serious bodily ailment; that plaintiff had theretofore been a strong, able-bodied man, engaged in a business or vocation which required great physical strength and endurance; that plaintiff had not theretofore suffered from any form of rheumatism or lumbago; and that plaintiff had not theretofore passed blood in the urine. Plaintiff's evidence further tended to show that, almost immediately after the commission of the assault by Gammon, and continuously thereafter, plaintiff has experienced pain in the small, or lumbar region, of his back; that plaintiff has frequently passed blood in urinating; that, within a few days after the commission of the assault by Gammon, a black-and-blue bruise appeared on the left side of plaintiff's back in the lumbar region, which bruise was about the size of a saucer, or of one's hand; that one of the attending physicians, upon examination of plaintiff, found a red and inflamed place of considerable area on the left side of plaintiff's back; and that such a bruise or inflammation might, or could, have resulted from, and ordinarily does result from, a trauma, or violent blow, upon the back of plaintiff. There is no evidence that plaintiff received any such trauma, or violent blow, upon the back other than that which the evidence tends to show was delivered by the special officer, Gammon, when Gammon "boosted" plaintiff in the back with his (Gammon's) knee. It is true that defendant's evidence tends to show that plaintiff's injuries might, or could, have resulted from a number of other causes. Notwithstanding the conflict in the evidence respecting the cause of plaintiff's injuries and disability, there is substantial evidence that plaintiff's injuries or disability are such as may, or could, have resulted from the assault committed upon plaintiff's body by defendant's special officer, Gammon. And even if there be substantial evidence that plaintiff's injury had occurred in one of two or more ways, such state of the evidence does not present a case of mere guess or conjecture respecting the cause of such injury. [Conner v. Railway Co., 181 Mo. 397, 411; Solomon v. Light & Power Co., 303 Mo. 622, 640; Thompson v. City of Lamar (Mo. Sup.), 17 S. W. (2d) 960, 970.]

In the Conner case, supra, it was said by this court: "If there is substantial evidence tending to show that an accident (injury) occurred in any one of two or more ways, or any other number of ways, while the burden rests upon the plaintiff to establish

such cause of the accident (injury) as would render the defendant liable, it by no means presents a case of mere conjecture; but is a question of fact, which should be submitted and determined by the triers of the facts. We only enter the field of conjecture in the absence of proof; when proof enters, conjecture disappears.'' So, in Wood v. Railway Company, 181 Mo. 433, 447, it was ruled by this court that, when a known and probable cause of plaintiff's physical condition and bodily injuries is shown by the evidence, the plaintiff will not be denied a recovery from the defendant who caused the injuries on the ground that some other cause or causes might also have produced the same bodily ailment or condition of health.

The trial court properly refused the peremptory instruction, in the nature of a demurrer to the evidence, requested by defendant at the close of all the evidence. The appellant's assignment of error must accordingly be overruled and denied.

II. Appellant assigns error in the giving of plaintiff's main instruction, numbered 1, which reads as follows:

''The court instructs the jury that if you believe and find from the evidence that on September 14, 1924, the defendant, the St. Louis-San Francisco Railway Company, was a common carrier of persons and passengers and as such maintained and operated a railroad and trains from Springfield, Missouri, to Memphis, Tennessee, and that on said day the plaintiff was a passenger on one of its trains and within one of the coaches thereof, then you are instructed that the defendant owed to the plaintiff, while he was such passenger, if you find that he was then a passenger thereon, the duty not to assault or strike him by or through its officers, agents or servants; if, therefore, you find and believe from the evidence that on the 14th day of September, 1924, plaintiff was a passenger on one of the defendant's trains running from Springfield, Missouri, to Memphis, Tennessee, and while as such passenger within one of the coaches of said train, he was assaulted by being kicked, pushed and struck in the back and forcibly and violently thrown into the toilet room of a coach of said train by Ed Gammon, who was, it is admitted, a special officer of the defendant on said train, and whose duties, it is admitted, were to maintain order on said train and to protect passengers on said train from being molested, disturbed or injured by other passengers, or by persons not passengers thereon, while the passengers were within the coaches of said train, and that said assault, if any, inflicted on the plaintiff and caused him the injuries and pain, if any, mentioned in other instructions, then your verdict will be for the plaintiff.''

Appellant claims that the giving of said instruction to the jury constitutes reversible error for the reason that the instruction is not within the purview of the evidence; in other words, it is the contention of appellant that there is no evidence that Gammon *kicked* plaintiff, either in the back or elsewhere upon the body, and that there is no evidence that plaintiff was forcibly and violently *thrown* into the toilet room by Gammon. It is true that the verb "kick," as ordinarily defined by lexicographers, means "to strike, thrust or hit violently *with the foot;*" but the verb "kick" is also defined as meaning "to strike violently *as if with the foot;* to impel or drive *as by kicking.*" While there is no positive evidence that Gammon struck or hit plaintiff with his (Gammon's) *foot,* there is substantial evidence on plaintiff's behalf that Gammon boosted, struck, or hit plaintiff in the back with his (Gammon's) *knee,* and that Gammon "shoved" plaintiff into the toilet room by placing his *knee* in plaintiff's back. It is evident from a reading of the record herein that appellant's counsel, upon the trial of the action, construed the word "kick" to be referable to the use of Gammon's *knee,* as an impelling force, rather than to the use of Gammon's *foot;* as, for instance, counsel for defendant, upon direct examination of defendant's witness, Gammon, inquired of said witness: "You may state to the jury whether or not you *kicked* him (plaintiff) with your *knee;*" and, again, "While you were holding him, were you holding him in a position that you could have *kicked* him in the back with your *knee?*" Furthermore, several instructions, given at the request and on behalf of defendant, told the jury that, in order to return a verdict in favor of plaintiff, they must find that plaintiff's injury or disability was caused "by being struck, pushed, *kicked in the back,* or violently *thrown* into the toilet." In other words, the inaccuracy or vice in the use of the word "kick" (if there be any inaccuracy or vice in the use of that word under the evidence herein) seems to have been common to the instructions given on behalf of both parties to the action, and, hence, does not constitute reversible error. [Johnson v. Electric Light Co., 232 S. W. 1094, 1098.] Having heard the evidence in its entirety, it is not likely or probable that the jury understood the word "kick" to have been used in the instructions of the respective parties in the technical sense, or meaning, of a striking *with the foot,* but rather as having been used in the general and wider sense, or meaning, of a striking *as if with* the foot, which striking, under the evidence herein, was done with the *knee* of Gammon as the impelling force.

Likewise, we think there is no merit in the claim of appellant that there is an absence of evidence (to support the plaintiff's instruction)

that plaintiff was "violently and forcibly *thrown* into the toilet room." The verb "throw" is commonly defined as "to drive or impel by violence." There is substantial evidence on behalf of plaintiff that Gammon "boosted" plaintiff in the back with his knee, and "shoved" plaintiff into the toilet room; "pushed him into the toilet with his (Gammon's) knee;" and that Gammon "turned him (plaintiff) loose when he (Gammon) hit him with his knee." Plaintiff's wife testified that, immediately after Gammon's assault, she saw plaintiff in the toilet room, "apparently getting up from the floor, all humped up," and that plaintiff seemingly was attempting to pull or raise himself to his feet by means of the window sill, or by means of a rod under the window sill, in the toilet room. The evidence, we think, was ample and sufficient to support the submission of the fact to the jury that plaintiff was "forcibly and violently thrown into the toilet room" by Gammon. We find plaintiff's instruction to be well within the purview of both the pleadings and the evidence.

The plaintiff's instruction is further criticised by appellant upon the ground that it singles out certain facts from the evidence, without including all the facts in evidence, and that it amounts to a commentary upon detached portions of the evidence. We do not view the instruction as being subject to such criticism. The instruction properly required the jury to find the existence of the essential facts or elements constituting the alleged wrongful assault, and therefore cannot well be said to have singled out such facts or elements of recovery, or to have given undue prominence thereto. Nor does the instruction indicate in the slightest what the trial court thought about the case, or what views the trial court entertained respecting the weight or sufficiency of the evidence. In other words, the instruction does not comment upon the evidence, or upon any part of the evidence. We find no reversible error in the giving of plaintiff's main instruction, and the assignment of error must be denied.

III. Appellant assigns error in the admission of certain medical testimony, given by Doctors Latimer and Mott in answer to hypothetical questions propounded by plaintiff's counsel. A question hypothesizing the facts in evidence, respecting the commission of the alleged assault upon plaintiff's body, and plaintiff's bodily ailment and physical condition thereafter, was propounded by plaintiff's counsel to Dr. Latimer, in which the medical witness was asked to state whether, in his judgment and opinion, plaintiff's physical ailment or condition was the result of lumbago, or whether such physical ailment or condition was *caused* by the striking and injury plaintiff received on the train at the hands of

defendant's agent and servant. The medical witness answered, "I wouldn't think you would get results like that (hypothesized in the question) from lumbago." He was then asked, "What would you think it was the result of; the *direct cause?*" and the medical witness answered, "Well, the appearance of a bruise is nearly always the result of violence somewhere." The further question was asked, "You would think, then, it was the result of violence?" to which the medical witness answered, "I would naturally assume it was; you wouldn't hardly get a bruise without you would have some traumatic condition or violence, I wouldn't think." Appellant contends that the hypothetical questions propounded to Dr. Latimer, and the physician's answers thereto, invaded the province of the jury, whose exclusive office and function it is to determine, as the ultimate fact, the cause of plaintiff's injury and disability. The record before us discloses, however, that the defendant, on the trial below, made no objection to the admission of such testimony upon the ground now urged on appeal, namely, that such testimony invaded the province of the jury. An objection not made or urged at the trial will not be heard or considered on appeal. [Rock v. Keller, 312 Mo. 458, 486; Heinbach v. Heinbach, 274 Mo. 301, 315; McCaffery v. Railroad Co., 192 Mo. 144, 161; Scheipers v. Railroad Co. (Mo. Sup.), 298 S. W. 51, 54.]

Furthermore, the hypothetical inquiry made of the medical witness by plaintiff's counsel related solely to a matter of technical knowledge and of medical science, of which technical and scientific subject-matter only a medical expert can speak intelligently, and of which subject-matter lay jurors have little, if any, understanding or knowledge; and, under the late rulings of this court upon the subject, it is not error to permit the medical expert to testify, and to give his opinion, as to what *caused* plaintiff's physical ailment, bodily infirmities and disability. [O'Leary v. Steel Co., 303 Mo. 363, 375; Wood v. Street Railway Co., 181 Mo. 433, 450; Busch & Latta Painting Co. v. Construction Co., 310 Mo. 419, 443; Rock v. Keller, 312 Mo. 458, 486; Schulz v. Railway Co., 4 S. W. (2d) 762, 768.]

It is further claimed by appellant that the hypothetical questions propounded to the medical witnesses, Doctors Latimer and Mott, assumed certain facts not in evidence, and omitted certain facts shown in evidence. The hypothetical questions thus criticised by appellant are quite lengthy, and no purpose will be served by quoting them herein. Suffice it to say that we have carefully read and analyzed the criticised hypothetical questions, in the light of the evidence set out in the record before us, and we find that such questions fairly and fully hypothesized the substantive facts and circumstances in evidence. The objections interposed at the trial to such hypothetical questions were general in nature, and counsel for defendant on the

trial did not undertake to call the attention of the trial court to any essential facts deemed to have been omitted therefrom, or to any facts hypothesized therein which counsel deemed to be unsupported by the evidence. In Scheipers v. Railroad Co., 298 S. W. 51, 54, this court, speaking through Blair, J., has lately said: "It is the duty of counsel, objecting to a hypothetical question on the ground that it assumes facts not in evidence or that it omits facts shown in evidence, to point out what matters not in evidence are assumed in, and what matters in evidence are omitted from such question. Failing to do this, the trial court is fully justified in overruling the objection. [Kinlen v. Metropolitan St. Ry. Co., 216 Mo. 145, 173; Edmondson v. Hotels Statler Co., 306 Mo. 216, 235; Pyle v. Kansas City Light & Power Co. (Mo. App.), 246 S. W. 979, 986; State v. Everhart (Mo. Sup.), 289 S. W. 604, 608.]"

Appellant does not suggest or assign that the verdict of the jury is excessive in amount, as respecting either the compensatory damages allowed, or the punitive damages assessed. Our attention has been directed to no reversible error committed by the trial court, and we find none in the record before us.

It follows that the judgment of the circuit court must be affirmed, and it is so ordered. *Lindsay* and *Ellison, CC.,* concur.

PER CURIAM:—The foregoing opinion by Seddon, C., is adopted as the opinion of the court. All of the judges concur.