[No. 29063. *En Banc.* January 24, 1944.]

ANNA B. CUNNINGHAM, as *Administratrix, Respondent,* v. LEWIS L. DILLS, *Appellant.*[1]

[1]Reported in 145 P. (2d) 273.

*Charles T. Peterson* and *Lester Seinfeld,* for appellant.

*Lee & Malm,* for respondent.

JEFFERS, J.—This is an appeal by defendant, Lewis L. Dills, from a judgment against him for damages, in favor of Anna B. Cunningham, administratrix of the estate of J. George Cunningham, deceased, resulting from an automobile accident. The action was instituted by the administratrix in her representative capacity and for the benefit of herself and son, as the surviving wife and minor son of the deceased.

The action is based upon the negligent operation by defendant of his automobile. It is alleged in the complaint that defendant was negligent in stopping and leaving standing his automobile, headed in a southerly direction, with its right side approximately eight feet from the westerly curbing of South Tacoma way, along and upon the paved, improved, and main traveled portion of the highway, without having the lights of his vehicle turned on, thus endangering the life, limb, and property of other users of the highway, especially of J. George Cunningham.

Defendant, by his answer, denied the allegations of negligence, and denied that plaintiff was damaged in any sum

whatsoever. Defendant alleged affirmatively that, if Mr. Cunningham suffered any injuries or damage as a result of his colliding with defendant's automobile, the same was caused wholly and solely by his own careless and negligent acts.

Plaintiff, by her reply, denied the affirmative matter set up in defendant's answer.

The cause came on for hearing before the court and jury on January 6, 1943, and thereafter, on January 7th, the jury returned a verdict in favor of plaintiff in the following amounts: For the benefit of the estate $560; for the benefit of the widow, five thousand dollars; for the benefit of the minor son, nothing. Defendant filed a motion for judgment notwithstanding the verdict, or in the alternative for new trial, which motions were by the court denied, and judgment was entered on the verdict February 4, 1943.

Appellant assigns error in overruling his motion for a nonsuit; in overruling his motion to discharge the jury and enter judgment of dismissal, made at the close of the case; in denying his motion for judgment notwithstanding the verdict or, in the alternative, for a new trial, and in entering judgment on the verdict; in refusing to give requested instructions Nos. 6 and 10, as to what constituted "parking"; in giving to the jury instruction No. 10, on the subject of parking; and in giving instructions Nos. 12 and 13.

The testimony relative to the accident and as to the activities of the parties involved just prior thereto, and of Mr. Cunningham up to the time of his death, is practically undisputed. We shall therefore set out in substance the material testimony concerning events occurring up to the time of Mr. Cunningham's death, involving, as it does, the questions of the claimed negligence of appellant, the contributory negligence, if any, of Mr. Cunningham, and the cause of Mr. Cunningham's death. As to the testimony of the doctors, however, we shall refer to it later, and discuss it in connection with the cause of death.

The accident occurred shortly after seven o'clock in the morning of November 22, 1941, on what is locally known as

South Tacoma way, between Seventieth and Seventy-eighth streets, the exact location not being material, as no intersection is involved. South Tacoma way, which is a part of U. S. Highway No. 99, from Fifty-eighth street south to the city limits is sixty feet wide. It is what is known as a four-lane road. The westerly lane, where the collision occurred, is eighteen feet wide, from the west curb east to the first yellow line, and from this line it is twelve feet to the next yellow line, which is the center of the highway.

At the time of the accident, both Mr. and Mrs. Cunningham were fifty-four years of age, and had living with them a minor son, J. George Cunningham, Jr.

On the morning of the accident, at about six-forty-five, Mr. and Mrs. Cunningham left their home in Tacoma, in their 1936 Pontiac sedan, intending to go to Portland, where Mr. Cunningham was to perform a marriage ceremony that afternoon. They drove out Sixth avenue to Union, and across Union to South Tacoma way. It was not foggy when they left home, but they ran into fog on Union avenue. Because of the fog lights along the highway, they went through the business district of South Tacoma with little difficulty, but after leaving that district the fog was quite bad. Mr. Cunningham was driving slowly and carefully, and, as they passed through the business district, he pulled over to the right-hand curb and cleaned off the windshield, on which fog was freezing. Mr. Cunningham then proceeded south and, as the fog continued to freeze on the windshield, he put his window down on the left side and drove by the yellow line. In view of the fact that this part of Mrs. Cunningham's testimony is referred to and discussed by appellant, we quote from her testimony:

"Q. Now, you proceeded south along South Tacoma Way; will you describe the manner in which Reverend Cunningham was driving? A. Well, on account of the fog freezing on the windshield he put his window down on the left-hand side and he was looking out the window driving by this yellow line. Q. *You mean looking ahead and guiding his car?* A. By the yellow line. Q. By the yellow line. What were you doing? A. Well, I had the window down on the

right-hand side and was looking out that way. Q. Looking forward? A. Well, no; out to the side. Q. Watching along the side? A. Yes, sir. Q. And was it at that time you noticed a car or cars parked along the side? A. Yes, sir. Q. Did you see more than one? A. I remember only one. Q. In your best judgment, by what distance did you pass that car? What was the distance between the right-hand side of your car and the car you passed? A. I would say several feet. Q. Now, at or about that time did your automobile come into collision with another car? A. Yes, sir. . . . Q. Will you describe the accident and what happened in that accident, to the jury, please? A. Well, our car struck this other car. We were both thrown forward and Mr. Cunningham, of course, was thrown against the steering wheel and we both got out of the car. . . . Q. After you got out of your car, Mrs. Cunningham, did you observe the position of Mr. Dills' car? I mean, where was it situated on the highway? A. Well, I would say it was about a foot and a half to two feet to the right of this yellow line by which Mr. Cunningham was guiding his car. Q. You mean here, that the left wheels of the Dills' car were about a foot and a half to two feet to the right of the center yellow line, is that correct? A. Yes, sir. Q. And that is the first yellow line out from the curb? A. Yes, sir. Q. Did you notice the curb along the side there, Mrs. Cunningham, on the right-hand side of the street? A. Well, yes, there was."

When the Cunningham car stopped, its left wheels were practically on the first yellow line out from the right-hand curb. After the Cunninghams got out of their car, Mr. Cunningham had some conversation with Mr. Dills, after which they got back into their car and drove to a Richfield station, where the car was left, and Mr. and Mrs. Cunningham took a bus to Portland, arriving in that city about one-thirty in the afternoon.

The following is in substance the testimony of Mr. Dills, who at the time of the accident was sixty-one years of age. On the morning of the accident, appellant had left his boarding house in Tacoma, in his 1936 Chevrolet, his destination being Fort Lewis, where he was employed as a mechanic. He had picked up a soldier at Twenty-fourth and Pacific. It was foggy, and Mr. Dills had stopped four times

between his home and the place of the collision to clean off his windshield, on which the fog was freezing. We quote from Mr. Dills' testimony:

"Q. What was the condition of the weather as to whether or not it was cold or warm? A. The weather was cold, exceedingly cold, and freezing fog. Q. What effect did that have on the moisture accumulations or other accumulations on the windshield of the car, if any? A. Well, the swipes could not keep it clean enough for you to look out of it two minutes; just as quick as you got it cleaned off it would start right in freezing again, and the windshield swipe would stop—well, you couldn't see anything, only looking out of the window, and it was foggy a good deal of the places, you couldn't hardly tell whether you were in the middle of the street or whether you were getting off to one side; you had to go by the feel of the street to drive along. Q. Where did this accident happen? A. It happened at 78th. Q. That is South 78th Street? A. South 78th and South Tacoma Way—known as South Tacoma Way. . . . Q. As you approached the place where the accident happened, what if anything did you do? A. Well, I was driving along there pretty carefully right then, trying to find a place where I could get off; and it just got so bad I had to stop, I couldn't see out. The fellow that was sitting beside me, he couldn't even see the curb at that time through the glass. Q. While you were stopped, did anything unusual happen? A. Yes. As soon as we stopped I applied my brakes, stepped out of the car, stepped upon the running board to look down to see if I could see the curb or a place that I could drive off, and before that, I had no more than got out there, just took a look there, I had a rag and I swiped it over the windshield, but it was frozen by that time, this other car came and hit my car, and hit it with such force that I was knocked out into the inside lane approximately two-thirds across the inside of the middle lane, knocked backwards—knocked backwards, the running board hit one leg and of course the other one being setting onto the running board just gave me a throw right backwards and I lit on the back of my head and hips. . . . Q. Now, your car. What was the condition of the windshield of your car when you stopped, as to whether there was ice on it or not? A. Yes, sir it was; it was invisible, you couldn't see through it. Q. What was the purpose of your stopping? A. To see where I

could get off from the street. I knew right at that particular place—[Objection. Witness allowed to complete his answer] A. The reason for stopping was to determine my position and to avoid running into another car or anybody that might be standing on the parking waiting for Fort Lewis buses, which at that particular place always had been kind of a gathering place for them to get onto a bus. And about ten feet farther from where I did stop, that was the end of the curb. . . . Q. How near from the curb were you when you stopped your car? A. My car was about four feet from the curb. Q. About four feet from the westerly curb? A. Yes, sir, right-hand side of my car. . . . Q. And what effect did this impact of the car behind have on your car, as to whether moving it or not? A. Well, it hit so hard it knocked the bumper off, the tail light and one fender, and caved in the whole back end next to the spare tire, away up into the back panel. Q. Was your car moved any by the impact? A. My car was knocked ahead at least eight feet."

Mr. Dills stated that, as he approached the scene of the accident, his lights were all on, and that, after the accident, while his tail light was knocked off, his headlights were still burning. After the accident, Mr. Dills talked with Mr. Cunningham and asked him if he was hurt, to which Mr. Cunningham replied "No; no, I am not."

Mr. Dills further stated that the Cunningham car was about two feet west of the yellow line after the accident, and his car was about five feet.

Before setting out more of the testimony, we shall discuss the question of the alleged negligence of appellant and the contributory negligence, if any, of Mr. Cunningham, as a determination of these questions is not dependent upon other testimony.

■ Appellant contends that the evidence was insufficient to establish any negligence on his part. We are of the opinion a determination of this question is dependent upon whether or not appellant was negligent in stopping his car on the main traveled portion of an arterial highway while he got out either to wipe off his windshield or determine his location on the highway.

Rem. Rev. Stat., Vol. 7A (Sup.), § 6360-108 [P. C. § 2696-866], provides:

"Except where angle parking is permitted by local ordinance every vehicle *stopped* or *parked* upon a roadway where there is an adjacent curb shall be so *stopped* or *parked* with the right-hand wheels of such vehicle parallel to and within twelve (12) inches of the right-hand curb. Angle parking shall not be permitted upon the city or town streets designated as forming a part of the route of a primary state highway through any city or town: . . ." (Italics ours.)

In this case it is undisputed that there was a curb adjacent to the roadway, and that appellant stopped on the main traveled portion of the highway, with his right-hand wheels more than twelve inches from the curb. Appellant cites no authority from this state holding that, under circumstances such as here related, the question of appellant's negligence would not be for the jury to determine. This is not a case where the driver of the car was compelled to stop because the car had become disabled and unable to move. Appellant stopped his car because of weather conditions, with which he was familiar, and regardless of which he continued to proceed. We do not mean to say that one driving on the highway, under conditions such as here shown to exist, must drive over to the curb and stop; yet, if one proceeds under such conditions, and then stops on the main portion of the highway and is run into by another user of the highway, we are of the opinion that the questions of whether or not such a driver was negligent, and whether or not such negligence was a proximate cause of the collision and resultant injury or damage to the driver of the other car, become questions of fact for the jury. In other words, one stopping on the main traveled portion of a highway, under the conditions here shown to exist, and for the reasons given by appellant, is not, as a matter of law, excused from being held in violation of the statute.

Regardless of what may be the rule in other jurisdictions, this court has on several occasions passed upon the rights and duties of one driving in fog.

We desire first to call attention to the case of *Thornton v. Eneroth,* 177 Wash. 1, 30 P. (2d) 951, where a contention similar to that made by appellant in the instant case was made on behalf of the defendant Eneroth. The general facts supporting the charge of negligence in the cited case are summarized in the opinion as follows:

"Supporting the charges of negligence as to Eneroth, there was evidence that, after once clearing his windshield of ice, he traveled three-quarters of a mile, and over that distance the ice again gradually accumulated until he could not see the road at all. In fact, he proceeded even after the windshield swipe failed to remove the rain as it solidified on the window, for which reason he turned it off. True, he stopped when he could no longer see, but it was for the jury to say from all facts and circumstances whether this was not too late, and whether the car was so operated and so stopped upon the highway as to constitute negligence."

We further stated:

"In considering the elements of negligence, there is no perceptible difference in continuing to drive a car until it becomes stalled by running out of gasoline, [see *Keller v. Breneman,* 153 Wash. 208, 279 Pac. 588] from proceeding until the vision is completely obscured by the gradual accumulation of freezing rain on the windshield and thereby becoming stalled. If the first may constitute negligence, certainly the latter may, because the driver's consciousness of the limit of visibility is always present. Counsel concedes that it would be negligence to proceed after one cannot see; and it may also be negligence to proceed until one's vision has been gradually, but completely, cut off, and then stopping on the highway, in the path of other vehicles necessarily traveling on that same side."

As we have stated, appellant in the instant case has cited no case from this court to sustain his contention. He quotes from *Hutchinson v. T. L. James & Co.,* 160 So. (La. App.), 447, in which case it was alleged that the defendant's truck was parked on the Chef Menteur highway, in violation of Act No. 21 of 1932, § 3, rule 15 (a), which provides that "No person shall park . . . any vehicle . . . upon the paved or improved or main traveled portion of any highway." The court said:

"We do not believe that the act referred to is applicable to this case because it can hardly be said that defendant's truck was 'parked' on the highway. It had simply stopped for a few seconds in order that its driver might ascertain if the road was clear for further progress."

It will be noticed that our statute makes it unlawful to *stop* or *park*, while the statute in the cited case refers only to parking. We do not think the cited case applicable here, nor are the other cases cited by appellant applicable, for reasons appearing therein.

The trial court did not err in submitting to the jury, as it did, the question of appellant's negligence.

It is next contended that the trial court should have held that Mr. Cunningham was guilty of contributory negligence as a matter of law. This contention and appellant's argument to the effect that the testimony does not show that Mr. Cunningham, at the time of the accident, was looking ahead or paying any attention to where he was going, are largely based upon the following testimony of Mrs. Cunningham:

"Q. Now, you proceeded south along South Tacoma Way; will you describe the manner in which Reverend Cunningham was driving? A. Well, on account of the fog freezing on the windshield he put his window down on the left-hand side and he was looking out the window driving by this yellow line. Q. You mean looking *ahead* and guiding his car? A. By the yellow line. Q. By the yellow line. What were you doing? A. Well, I had the window down on the right-hand side and was looking out that way. Q. Looking forward? A. Well, no; out to the side." (Italics ours.)

Appellant argues that it does not appear from the testimony that either Mr. or Mrs. Cunningham was looking ahead, and appellant further states that to say that Mr. Cunningham was looking ahead is to assume something not in evidence.

We cannot agree with this interpretation of the above testimony. While it is apparent therefrom that Mrs. Cunningham was not looking ahead, we think it just as appar-

ent that Mr. Cunningham was looking ahead and driving by the yellow line.

Appellant cites several cases from this state, which he contends sustain his position. He particularly relies on the case of *Eldredge v. Garrison,* 184 Wash. 687, 52 P. (2d) 1240. The decision in the cited case, that the plaintiff was guilty of contributory negligence as a matter of law, was based upon the rule that one driving through fog is held to a high degree of care, and is barred from recovery for damages resulting from a collision with some object upon the road unless he was proceeding with due care. Based upon the facts in the cited case, the court concluded that Mr. Eldredge was not driving with the degree of care required of him under the circumstances. Some of these circumstances were that at the time of the accident Eldredge could see forty feet ahead of him; that he was driving too fast under the conditions then existing; that, just before the collision, he drove around a frame set on the highway, upon which there was a red cloth. Clearly, it seems to us the facts in the cited case are so different from those in the instant case as to make the case inapplicable.

In *Woodward v. Simmons,* 7 Wn. (2d) 10, 108 P. (2d) 637, cited by appellant, while we stated that respondent Simmons (defendant in the court below) was guilty of negligence in driving his car at a speed of thirty-five miles per hour, under the conditions then existing, we affirmed the judgment of the lower court in holding that such negligence was not a proximate cause of the collision.

The question here presented depends upon the facts in the particular case. We are of the opinion that it cannot be held as a matter of law that Mr. Cunningham was guilty of contributory negligence, under the facts in this case.

In support of our conclusion, we first desire to refer to the case of *Farrow v. Ostrom,* 10 Wn. (2d) 666, 117 P. (2d) 963, wherein we quoted from *Hull v. Seattle, R. & S. R. Co.,* 60 Wash. 162, 167, 110 Pac. 804, as follows:

" '[The] victim of an accident is entitled to have his conduct judged by the circumstances surrounding him at the time of the accident—by the conditions as they appeared to

one in his then situation—and if his conduct when so judged appears to be that of a reasonably prudent person, he cannot be said to be guilty of negligence.' "

In the cited case, we stated:

"When contributory negligence is urged as a matter of law, the question is to be determined in the light of the evidence most favorable to plaintiff. *Weinman v. Puget Sound Power & Light Co.*, 175 Wash. 73, 26 P. (2d) 395."

In *Devoto v. United Auto Transportation Co.*, 128 Wash. 604, 223 Pac. 1050, one of the plaintiffs testified to the effect that the fog lay in banks or strips, in places not so dense as to interfere with a reasonable view ahead, but, proceeding, they came into places where the fog was so dense that the white light of the headlights was mirrored back to the driver, and he could see nothing in advance of the automobile. The opinion states:

"Under such conditions, shall a driver stop in the fog bank until the fog clears? If one does so, all must do so, or the danger would be thereby increased; and if all stop, how shall anyone reach his destination? It seems to us in reason that traffic must be permitted to move on the highway at all times, but that, in driving through a fog bank, each driver must do so in a careful and prudent manner with due regard for the safety of others, *and what is careful and prudent under the particular conditions shown will usually be a question for the jury.*" (Italics ours.)

In *Morehouse v. Everett*, 141 Wash. 399, 252 Pac. 157, 58 A. L. R. 1482, we refused to follow the "drive within the radius of your lights" rule, and thereafter stated:

"In many portions of this state fogs are frequent—fogs so thick that the driver of an automobile cannot, by means of his headlights, clearly distinguish an object five feet in front of him. Must he stop on the road? If so, all others must do the same, and thus all traffic must cease. And in the process of stopping and blocking the road, many collisions must occur. A rule that will force this condition is a dangerous one and must do infinitely more harm than good."

See, also, *Crowe v. O'Rourke*, 146 Wash. 74, 262 Pac. 136.

We are satisfied that, under the facts in this case, whether or not Mr. Cunningham, at the time of the collision, was

driving with that degree of care required of him, and whether or not he could or should have seen appellant's car in time to stop, thereby avoiding a collision, were factual questions, and properly presented to and considered by the jury.

We now come to the question of the cause of death.

We shall first go back and take up the testimony of Mrs. Cunningham concerning events which occurred immediately after the accident. It will be remembered that, after the collision, Mr. and Mrs. Cunningham boarded a bus and proceeded to Portland, where they arrived about one-thirty p. m. Mrs. Cunningham testified that, while her husband was able to perform the marriage ceremony, he was in a great deal of pain all day, and complained of his chest and side. The Cunninghams returned to Tacoma that evening. The next day being Sunday, Reverend Cunningham preached his morning sermon, although he was in a great deal of pain, but he did not hold any evening service, because of his physical condition. On Monday, November 24th, he consulted Dr. Henry Hook, of Tacoma.

It further appears from Mrs. Cunningham's testimony that prior to the accident her husband suffered from no disease, injury, or disabiliy of which she was aware. His health was very good, and he was an active man. She then described many of the activities in which he was engaged prior to the accident. He had four regular services which he attended each Sunday. Mrs. Cunningham testified that, after the accident and during the month of December, her husband did not act like himself at all; that he seemed to want to rest when he came home, and would lie down on the davenport, something he had not done before; that during the month of January he complained of pain in his chest on the left side; that he did not do so much calling, and cut down on his duties as much as possible, and did not take much part in civic affairs; that there was a decline in his health during this time, and up until February 6th when he died. Mr. Cunningham took cold the latter part of January, but seemed much better just before he

died. He continued to consult Dr. Hook from the Monday following the accident, until about the first of February, or five days before his death. On the evening of Mr. Cunningham's death, he and his wife had been downtown to dinner, and had stopped at a filling station to get gas, where Mr. Cunningham had some kind of an attack and died.

George Cunningham, Jr., the nineteen year old son of Mr. and Mrs. Cunningham, testified that his father's health was good before the accident; that he had never been sick that the witness remembered; that his father was an active man and liked sports; that he gave up golf, which he had often played; that he would come into the gas station where George worked and would just "kind of slump, and you could see that he wasn't feeling good."

Dr. Hook, who has practiced as an osteopathic physician since 1901, and who was admitted to practice in this state in 1924, testified that, prior to coming to Washington, he practiced in Grand Junction, Colorado, from 1903 to 1925, in Chehalis from 1925 to 1928, and in Tacoma since 1928. He attended what was then called the American School of Osteopathy, now called Kirksville College of Osteopathic Physicians & Surgeons, located at Kirksville, Missouri, where he took the courses usually given in such schools, including osteopathy, neurology, psychology. He stated that his studies were concerned with the heart and lungs; that in his practice he has attended many patients where the ailments pertained to heart diseases.

The doctor became acquainted with Mr. Cunningham in the Kiwanis Club sometime before the accident, and thereafter Mr. Cunningham came to his office at various times for a check-up during the year 1941. About a month before the accident, the doctor examined Mr. Cunningham, especially his heart, lungs, and gastro-intestinal system, and found nothing organically wrong with him; his heart and lungs seemed to be all right at that time. On November 24, 1941, Mr. Cunningham came to the doctor for an examination, stating that he had been injured in an automobile accident. The doctor examined him, and found what he

termed a fractured rib on the left side. Mr. Cunningham complained of much pain in the area of the seventh rib. The doctor taped Mr. Cunningham, which he stated was the usual treatment, and prescribed gentle manipulation of the upper spinal column and rest.

Mr. Cunningham consulted the doctor on November 26th and 29th, and complained of pain along the junction of the seventh rib with the intercostal cartilage. The doctor saw Mr. Cunningham on December 3rd, at which time he did not seem to be in so much pain. On this visit the doctor gave him some sedative manipulations, and tightened the tape. The doctor again saw deceased on the 6th, 9th, 13th, 18th, and 20th of December, during which time Mr. Cunningham's condition seemed to improve. The doctor also saw deceased on the 2nd, 6th, 27th, 28th, 29th, 30th, and 31st of January, and February 1st. In the early part of January, the fracture seemed to have pretty well healed and the doctor removed the tape. The last time the doctor saw Mr. Cunningham, he still complained of pain, and had not gained strength as he felt he should or as the doctor had hoped he would. On January 27th, Mr. Cunningham took cold, which in the doctor's opinion was due to the patient's lowered resistance, caused by the injury he received in the automobile accident. The doctor was not called at the time of Mr. Cunningham's death, nor did he examine him thereafter. There was no autopsy.

At this point we desire to quote from the testimony of Dr. Hook on his direct examination:

"Q. In your opinion what was the cause of his death? A. I think there is no question but what there was a clot formed in a vessel somewhere that finally reached his heart. Q. What? A. A clot or thrombosis or embolism, or what you want to call it. Q. What did you call it? A. I call it a thrombus. Q. What is a thrombus? A. A clot of blood. Q. What causes a thrombus? A. An injury. Q. Do you know of any injury that Reverend Cunningham suffered except the one of which we have already spoken in connection with the automobile accident in question? A. Other than the fact that in this severe cold, he had a great deal of hard coughing. Q. Did you sign the death certificate?

A. I did. Q. What, doctor, did you ascribe as the cause of the death of J. George Cunningham? A. Coronary thrombosis, is what I put on the death certificate. Q. Is that what in your opinion was the cause of his death? A. Yes, sir. Q. What was the coronary thrombosis due to? A. It was eventually due to a clot of blood that had passed from some injury, from some injured vessel, back to the heart, which got finally into the coronary arteries. Q. Doctor, are you aware of any—from your examination and treatment of Reverend Cunningham, are you aware of any cause whatsoever intervening between the time of the automobile accident and his death, as the cause of his death? A. May I get that a little better? Just what did you say? [Last question repeated] A. Unless there could have been a rupture of a vessel in his coughing; I rather doubt that, but that is possible. Q. Now, will you state the cause of his cold, in your opinion? A. Well, he would not have taken cold had he not had lowered resistance. Q. And the cause, in your opinion, was lowered resistance from what? A. Original accident. Q. Doctor, in your opinion, without the injuries which Reverend Cunningham suffered in the automobile accident on the 22nd of November, 1941, in your opinion would he have died on the 6th of February, 1942? A. I don't see any reason why he should. Q. Would he or would he not? A. It is my opinion he would not. We are all subject to such things, you know."

The doctor was asked, among others, the following questions on cross-examination:

"Q. You have in your experience known of many cases of death from coronary thrombosis that were not related in any way to an accident, haven't you, or a lesion? A. I think I have, yes. . . . Q. Now, just what conditions, other than a blood clot, are ordinarily and usually present in cases of coronary thrombosis? A. It could be—there could be a fatty deposit, that is fatty formation that has broken off from somewhere along the line of the blood flow, or it could be a little tissue of some kind broken off from some diseased condition. Q. Well, what condition do you usually or ordinarily expect to find with respect to the coronary artery itself? A. Itself? Q. In cases of coronary thrombosis. A. The coronary thrombosis, as I understand it, is the result of some object, it may be an embolism, it may be a thrombosis that enters the coronary artery and cannot get around it, get through. Q. But isn't it due gen-

erally and primarily—don't medical men agree that it usually occurs in cases where there is an arterial sclerosis [hardening of the arteries]? A. Not necessarily. Q. Well, usually? A. Well, you might say possibly, yes. Q. But isn't that usually present? A. I would not say that it is necessarily usually. Q. Well, probable? A. It could be, oh, yes. Q. We are trying to get at probabilities; that is what we are interested in, not possibilities but probabilities. A. Yes. Q. You expect to find, don't you, in most, as a matter of fact, in practically all cases of coronary thrombosis, you expect to find a hardening of the arteries? A. I wouldn't say that, that is not so in practically all cases; it is in a good many cases. Q. In a majority of cases it is true, isn't it? A. Yes, I think perhaps a majority. Q. And the hardening of the arteries is a progressive development? A. Yes, sir. Q. It comes over a very long period of time? A. Quite so. . . . Q. Now, do you want this jury to understand that it is your opinion that this fractured rib was responsible for the death of George Cunningham ten weeks thereafter? A. They can draw their own conclusion; that is my opinion. Q. That is your opinion? A. Yes, sir. I think the man would still be alive but for that. . . . Q. What you observed. You would not know whether he had hardening of the arteries or not? A. No more than anybody else would know about their business, what they cannot see. It is my opinion the man had a clot or something of that nature that stopped the heart. Q. You do not know then, except from observation, any tests or examination made, whether or not he did have hardening of the arteries? A. If I were to say definitely, in my own mind he did not."

Appellant called Drs. W. B. Penney and Joseph R. Turner. Neither of these doctors saw Mr. Cunningham before or after the accident. Dr. Penney has limited his field to internal medicine, giving special attention to diseases of the heart. He testified that coronary thrombosis was a disease of the heart, and after describing the heart, he continued:

"In a coronary thrombosis—the word thrombosis means clotting, and in a coronary thrombosis it means that in some part of one of these arteries furnishing the blood to the heart that there is a stopping of that blood flow and there is a clot. Then that part of the heart which that particular

vessel supplies is shut off from its blood supply and there will be a small triangular space, whatever amount of muscle that is furnished by that particular artery that was shut off, then that is shut off from its blood supply. That muscle then, not being furnished blood supply, dies, becomes liquid; if we had it on the outside of the body we would call it a sore or an ulcer. That muscle is destroyed, and in the process if that is severed, death occurs right at the moment that it occurs. If recovery takes place, it takes place over a period of a week, and this destroyed tissue is absorbed through the surrounding blood vessels and in there builds a new scar, a new blood vessel through this area. . . . Now, blood will not clot in a normal blood vessel; if it would, we would always be subject to gangrenous fingers and toes and all the other things that come.

"Before we can have a thrombosis it is necessary for a change to have taken place in the inside walls, not necessarily the inside but in the walls of the vessel, that is, the blood to sop in. And that condition is known as a coronary sclerosis, or you can think of it even as you hear of hardening of the arteries, which is a changing or getting old process of the arteries of the heart. And when that thrombus occurs, it has been in a vessel that was previously diseased, and this disease is the process of the years of that individual's life; it is not something that happens in a day or a week or a month or three months or six months, it is a gradual change that has been coming on.

"Q. Dr. Penney, is coronary thrombosis ordinarily or the probable result of a bruise or injury, we will say, to the chest or any other part of the body, so far as that is concerned? A. The development of a coronary thrombosis depends on a diseased blood vessel to an extent, and any injury does not produce that underlying changed condition. An accident could produce a clot in the heart if you had a lot of the muscles damaged; the same as a bruise anywhere else, but it would not produce the condition we know as coronary thrombosis."

Mr. Peterson then propounded to the doctor a hypothetical question which covered the facts as to Mr. Cunningham's condition, and included the facts as stated by Dr. Hook. Based upon this statement, as supplemented by Mr. Malm, the witness was then asked whether or not in his opinion the automobile accident and the resulting injuries,

assuming they did occur, had any relation to the death of Mr. Cunningham from coronary thrombosis. The doctor replied:

"Assuming that the cause of death as given, coronary thrombosis, was correct, the accident some ten weeks about, wasn't it, something like that, could not have produced a coronary thrombosis that waited for ten weeks to manifest itself. A coronary thrombosis that would have occurred at the time of the accident would have undoubtedly been more incapacitating. The finding of shock two days after would not be in keeping with shock following an accident, because an accidental shock follows immediately after an accident and continues. So that, as presented, I would say the accident could not have produced the pain and main effect in producing a coronary thrombosis, which probably occurred at the time of death. Sudden death was probably due to the thrombus that occurred at that time. Arterial sclerosis or coronary thrombosis would have been years in developing and would not have been produced by the accident ten weeks before."

The doctor further testified that one could have a coronary thrombosis due to trauma, if the trauma was directly to the heart; that the treatment for coronary thrombosis is complete rest; that a thrombosis is a clot of blood in a vessel, and an embolism is a plugging of a vessel, which will produce exactly the same effect as a clot. The doctor further stated:

"I would say the cause as presented would not give me any reason to think that it was. The cause as presented is a definite case of a man with arterial sclerosis developing in a large, a big heavy man, which has the best background for that sort of a thing leading up to a time when that heart could no longer carry on."

Dr. Turner testified that coronary thrombosis was a disease of middle or advanced age, usually occurring as a result of hardening of the arteries. He stated, in answer to a hypothetical question, that in his opinion the accident and resulting injuries had nothing to do with Mr. Cunningham's death from coronary thrombosis. He was then asked to give his opinion as to whether or not there was any relation

between the alleged injuries and Mr. Cunningham's death, leaving out the question of coronary thrombosis, to which he answered:

"That is a very hard thing to draw a conclusion from. The death most likely, from the story, was coronary thrombosis, and so it would be hard to draw a conclusion about something else."

We do not deem it proper to enter into a discussion of the qualifications of the three doctors who testified in this case. Their qualifications were before the jury. They have all been admitted to practice their profession in this state. They all gave their opinion, Dr. Hook based upon personal contact and examination of the deceased, Drs. Penney and Turner upon a hypothetical question. We do not purport to be well enough informed to say that one was right and the other wrong. The jury heard their testimony and that of Mrs. Cunningham and George Cunningham, Jr., and apparently believed that the cause of Mr. Cunningham's death was directly related to the accident of November 22nd, and the injuries received by him as a result thereof, and we are of the opinion there was substantial evidence to support the jury's verdict.

Appellant cites no cases to sustain his contention on the question here under consideration.

In support of our conclusion, we first call attention to the case of *Loveless v. Red Top Cab Co.*, 158 Wash. 474, 291 Pac. 344, 79 A. L. R. 347. In that case the testimony of the doctors was in direct conflict as to the cause of death. In the instant case, as in the cited case, taking into consideration the history of the case, as related by Mrs. Cunningham, her son, and Dr. Hook, we think there was substantial evidence to take this question to the jury.

See, also, *Hill v. Great Northern Life Ins. Co.*, 186 Wash. 167, 57 P. (2d) 405.

In *MacDonald v. Metropolitan Street R. Co.*, 219 Mo. 468, 118 S. W. 78, the court stated:

"Nor do we have to go to physicians to find that medical science has not developed to the point where a doctor, how-

ever wise, can tell to a certainty whether a disease exists in the heart for one, two, three, or four months after an injury, or that such insidious diseases not uncommonly quite baffle diagnosis. It must be borne in mind, too, that doctors' theories under oath on the witness stand are merely advisory in character. Juries can take or leave that advice on the condition only that it seems reasonable or not to them; and, because doctors disagree, it is not valid reasoning to say that juries should also disagree, or should take the advice of one set as against that of another, or should throw to the winds their common sense and, with minds littered up with conflicting medical advice, be unable to come to any agreement whatever, even as sailors (tossed to and fro by contrary winds) reach no harbor."

We also call attention to the quotation in the cited case from *Sharp v. Missouri Pac. R. Co.*, 213 Mo. 517, 111 S. W. 1154, as to the effect of lay evidence.

See, also, *Averdieck v. Barris*, 87 Cal. App. 626, 262 Pac. 423, where the accident to the deceased occurred on October 13, 1921, and death occurred on May 27, 1923, nineteen and one-half months later.

It is next contended the court erred in refusing to give appellant's requested instructions Nos. 6 and 10.

Requested instruction No. 6 purports to give a definition of the word "parking," and then continues:

"So that if you should find from the evidence that the automobile of the defendant was stopped temporarily by defendant while defendant was engaged in removing ice from the windshield, and defendant was so engaged at the time of the collision, then such stopping of the car would not constitute parking within the meaning of the ordinance of the city of Tacoma which I have called to your attention."

No ordinance of the city of Tacoma was pleaded by title or otherwise, nor was any ordinance introduced as an exhibit. Clearly, the court did not err in refusing to give this instruction.

Requested instruction No. 10 is as follows:

"If you find from the evidence that the automobile of the defendant, Dills, was stopped on the highway temporarily for the purpose of removing ice from the windshield and Dills was so engaged at the time of the accident, and you

further find that the lights on said car were in order and burning or lighted, and that while in such condition the same was run into from the rear by the Cunningham car, then it would be your duty to find a verdict for the defendant, even though you find from the evidence that the Dills car was not within one foot of the curb along the street or highway, and that the view of the driver of the Cunningham car was obstructed by fog."

The court did not err in refusing to give requested instruction No. 10, as it does not, in our opinion, properly state the law as applied to the facts in this case.

We may say here that instruction No. 10, given by the court, covers the question of stopping or parking, and it seems to us is as favorable to appellant as the facts and the law would permit. While error is assigned on the giving of this instruction, no argument is made in regard thereto.

The last contention of appellant is that the court erred in giving instructions Nos. 12 and 13. Instruction No. 12 is as follows:

"You are further instructed that in an action such as this, you are entitled to find that an injury is the proximate cause of the death, although a disease intervenes, if you find that the injury caused the disease from which death resulted, or, if the injury did not cause the death, you find that it concurred with the disease as a direct agent in producing death and without which death would not have resulted when it did, where you find further there was no intervening act or neglect on the part of the decedent or a third person which contributed to the fatal result."

There was testimony in this case that shortly before his death Mr. Cunningham contracted a severe cold, which caused rather violent coughing, and there is testimony that this cold was brought on due to his lowered resistance, which, in turn, was due to the injuries received in the accident. In view of this testimony, we do not think the court erred in giving instruction No. 12.

By instruction No. 11 the jury were told that it was essential to a recovery of damages by respondent that the wrongful act, neglect, or omission of appellant, if any, was the proximate cause of the injury and death resulting there-

from; that a proximate cause of the injury and death exists where that injury and death would not have occurred without the act or neglect of appellant, which act or neglect produced the injury and death in a natural and continuous sequence unbroken by any new, independent cause.

Instruction No. 13 states:

"You are further instructed that a person who by his wrongful or negligent act or omission accelerates a diseased condition, thereby hastening and prematurely causing the death of the diseased person may be held liable even though that disease would probably have resulted in death at a later time without any wrongful or negligent act having been committed. If you find from the evidence in this case that the defendant was negligent, that the deceased was not guilty of contributory negligence, and that the negligence of the defendant was the proximate cause of the death, the fact that the physical condition of the deceased contributed to his death does not relieve the defendant of liability. There is no liability on a defendant in an action such as this, however, for a death which results from a pre-existing disease which the deceased had and which death did not result from any wrongful act or negligence on the part of the defendant."

Appellant argues that there was no evidence as to any existing disease, nor any evidence of any aggravation of any ailment. Counsel for appellant first attempted to bring out on the cross-examination of Dr. Hook that in cases of coronary thrombosis the patient usually is found to have arterial sclerosis, or hardening of the arteries. Dr. Penney testified that where there is a thrombosis, there is a vessel which was previously diseased, and that disease is the product of years of that individual's life. Dr. Penney further testified:

"The cause as presented is a definite case of a man with arterial sclerosis developing in a large, a big heavy man, which has the best background for that sort of a thing leading up to a time when that heart could no longer carry on."

It will be remembered that Dr. Turner also testified that coronary thrombosis occurs as the result of hardening of the arteries.

We think instruction No. 13 was properly given, under the facts of this case, for while the jury may have concluded that Mr. Cunningham was, and prior to the accident had been, afflicted with hardening of the arteries, still, notwithstanding the disease, if they believed from the evidence that the negligent acts of appellant and the injuries to Mr. Cunningham resulting therefrom caused his death prematurely, appellant would not be relieved from liability.

The judgment of the trial court is affirmed.

BEALS, BLAKE, MALLERY, and GRADY, JJ., concur.

STEINERT, J. (dissenting)—I dissent upon the ground that the evidence was insufficient to support a finding that the death of the deceased was caused by or attributable to the collision here involved.

SIMPSON, C. J., ROBINSON, and MILLARD, JJ., concur with STEINERT, J.

